DMP/ICR
F. #2016R00532

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

SINMYAH AMERA CEASAR,

              Defendant.

Docket Nos. 17-CR-048 (KAM)
19-CR-117 (KAM)
22-CR-459 (KAM)

- - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT'S SENTENCING MEMORANDUM

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Douglas M. Pravda
Ian C. Richardson
U.S. Department of Justice
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

I.   The Defendant's Offense and Relevant Conduct................................................. 4

     A.   The Material Support Offense and the Defendant's Efforts to Cooperate
          (No. 17-CR-048) ......................................................................................... 4

     B.   The Defendant's Bail Violations and the Obstruction Offense (No. 19-CR-117)........ 7

     C.   The Defendant's Consolidated Sentencing on the Material Support Offense
          And the Obstruction Offense...................................................................... 11

     D.   The Defendant's Misconduct While Incarcerated at FCI Tallahassee....................... 17

          1.   The Defendant's Continued Circumvention of BOP Regulations While
               Incarcerated ..................................................................................... 17

          2.   The Defendant's Continued Affinity for Violent Extremist Ideology and
               Association with Supporters of Violent Extremist Beliefs While Incarcerated.... 19

     E.   The Defendant's Violations of the Conditions of Her Supervised Release
          And Related Misconduct............................................................................. 20

          1.   VOSR Charges One through Three: August 13-October 16, 2020 ...................... 21

          2.   The Additional Misconduct Identified in the Government's March 29, 2021
               VOSR Sentencing Letter .................................................................... 22

               i.    The Defendant Recontacted a Known Islamic Extremist......................... 24

               ii.   The Defendant's Efforts to Deceive Probation Regarding Her Use
                     Of Social Media Applications.......................................................... 27

               iii.  The Defendant's Use of Undisclosed Electronic Communication
                     Applications to Communicate With and Solicit Funding From an
                     ISIS Supporter............................................................................ 29

               iv.   The Defendant's Destruction of Evidence of Her Violations of Her
                     Conditions of Supervised Release .................................................... 38

               v.    The Defendant's Continued Use of Extremist Language ........................ 39

               vi.   The Defendant's Unapproved and Unreported Contacts with
                     Convicted Felons ........................................................................ 40

vii. The Defendant's Continued Creation and Use of Undisclosed Apps
And Online Accounts ................................................................. 41

3. The Defendant's Conduct While Sentencing on the VOSR Was Held
In Abeyance ................................................................................ 43

i. The Defendant's Failure to Cooperate with the DEEP Assessment .......... 43

ii. The Defendant's Eviction from Hope House ............................. 44

iii. The Defendant's Continued Violations of the Conditions of Her
Supervised Release at the Wolcott Hotel .................................... 46

F. The Defendant's Flight From Prosecution Resulting in Her Conviction for the
Failure to Appear Offense (No. 22-CR-459) ............................... 48

1. The Court of Appeals' Decision, the Government's Motion for Detention and
VOSR Charges Four through Eight ............................................ 48

2. The Defendant's Flight ............................................................. 50

3. VOSR Charges Nine through Eleven ......................................... 61

4. The Defendant Pleads Guilty to the Failure to Appear Offense and to VOSR
Charges Four and Nine .............................................................. 61

G. The Defendant's Continued Post-Arrest Violations of BOP Rules and Denials of
Responsibility ............................................................................... 62

1. Violating BOP Communications Monitoring Restrictions ................... 62

2. The Defendant's Continued Efforts to Contact ISIS Supporters ............. 63

3. The Defendant's Relationships with Incarcerated ISIS Supporters ............ 64

4. The Defendant's Continued Use of Extremist Language and Concepts ............. 66

5. The Defendant's Continued Communication with Felons ................... 67

6. The Defendant's Continued Denial of Accountability ...................... 68

II. The Guidelines Sentencing Range ...................................................... 69

A. The Government's Guidelines Calculation .................................... 69

B. The Government's Disagreement With Probation's Guidelines Calculation ............ 72

C. The Court Should Reject or Disregard the Defendant's Guidelines Objections ........ 73

D.  Consecutive Sentences and the Interaction with the Supervised Release Violations . 80

III. The Court Should Impose a Guidelines Sentence for the Material Support, Obstruction and Failure to Appear Offenses ........................................................................... 81

A.  The Nature and Seriousness of the Defendant's Conduct, the Need for Just Punishment and the Need to Protect the Public From the Defendant Warrant a Guidelines Sentence ....................................................................................... 82

1.  The Material Support Offense ........................................................... 82

2.  The Obstruction Offense and Failure to Appear Offense...................... 88

B.  The Defendant's History and Characteristics Support a Guidelines Sentence .......... 90

C.  The Need to Avoid Unwarranted Sentencing Disparities Supports the Imposition Of a Guidelines Sentence ............................................................................. 98

D.  A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law............................................................. 100

CONCLUSION............................................................................................ 103

PRELIMINARY STATEMENT

Since her initial arrest eight years ago, which thwarted her attempt to board a flight out of the United States on the first leg of a journey to ISIS's caliphate in Syria, the defendant Sinmyah Amera Ceasar has demonstrated a prodigious capacity for deception and ingenuity in circumventing every monitoring condition that this Court could impose to ensure that the defendant will not re-engage with extremists and terrorists. Since pleading guilty to conspiracy to provide material support to ISIS in November 2016 pursuant to a cooperation agreement with the government—her first second chance—the defendant has been gifted and discarded dozens more. Time and again, the defendant has lied to and misled prosecutors, law enforcement agents, pretrial services officers, probation officers, halfway house staff, psychologists and the Court, seeking sympathy and leniency for a virtually unbroken eight-year streak of misconduct that now encompasses two additional felony convictions, numerous violations of conditions of bail and supervised release, a host of prison disciplinary violations, and attempts to circumvent the monitoring of her behavior online beyond counting.

These consolidated criminal cases are now before the Court for resentencing on remand from the Court of Appeals after that court found "shockingly low and unsupportable as a matter of law," United States v. Ceasar, 10 F.4th 66, 70 (2d Cir. 2021), the defendant's original 48-month sentence for her first two felony convictions, for conspiracy to provide material support to ISIS, a designated foreign terrorist organization, under docket number 17-CR-048 (the "Material Support Offense"), and for obstruction of justice, under docket number 19-CR-117 (the "Obstruction Offense").

This matter would be serious enough if that is all it concerned, but within days of learning of the Court of Appeals' decision and the government's request that she be detained pending resentencing, the defendant recruited prior convicted felons she met while living in

transitional housing to aid her attempt to flee the country for Russia.  On the run from the law, the defendant did what she has consistently done over the last eight years, she promptly obtained access to an Internet-enabled electronic device and downloaded encrypted messaging applications.  As news outlets reported on an ISIS terrorist attack at the Hamid Karzai International Airport in Kabul, the defendant set about attempting to reach her old ISIS contacts in Afghanistan asking for assistance to travel to there or nearby.  Captured again, the defendant pleaded guilty to willfully failing to appear before the Court, under docket number 22-CR-459, and upon returning to Bureau of Prisons custody, sought out other convicted and accused ISIS supporters for friendship and community.

The defendant's sentencing brief continues a theme that she has advanced throughout this lengthy saga: that the defendant is a victim, and every decision she makes, every rule she evades, every condition of supervised release she violates, and every crime she commits is the work of her traumatic personal history.  The defendant's version of her story depicts her as a passenger in someone else's life, a journey over which she has no control and for which she bears no responsibility.  In the defendant's telling, her personal trauma does not merely mitigate her criminal behavior, it wholly excuses it.

In remanding this case for resentencing, the Court of Appeals has already rejected that argument.  Faulting the district court for having "considered her background and ensuing needs for mental healthcare and rehabilitation nearly to the exclusion of countervailing sentencing factors," the Court of Appeals explained that the role the defendant's "traumatic history" played in motivating her to commit the offense "does not, however, cancel out the seriousness of her offenses."  United States v. Ceasar, 10 F.4th 66, 80 (2d Cir. 2021).

Five years have now passed since the district court imposed the "shockingly low" sentence that the Court of Appeals reversed in August 2021.  With that time the defendant might have put action behind her request for "the opportunity to show you all I can be a productive citizen and hope you all accept my sincerity"; her promise to live her life by the rules: "I swear today to assure all of you I will comply to the rules and to get my priorities fulfilled. Even more so, I will build my life around positive people," Sent. Tr. at 343; and her promise to steer clear of extremists: "I understand the actions I took were wrong, and I will never do it again. I'm not -- I'm not going to engage with any terrorists or radical groups," Sent. Tr. at 341.  But as exhaustively detailed below, the defendant has done the opposite.

The defendant's conduct over the last five years has only confirmed that she has no intention of complying with the rules and will seek every opportunity to obtain unmonitored access to the Internet, social media, and electronic communications services so that she can resume her association with extremists and convicted felons free of law enforcement interference.  The defendant has employed the same skills, techniques, and ingenuity she used when attempting to evade law enforcement while committing the Material Support Offense to circumvent the government's and the Probation Department's efforts to monitor her behavior online. She has regularly lied to or deceived her probation officer about her compliance with these rules and attempted to destroy evidence of their violation.  And in telephone calls, interpersonal interactions, and other moments when she believes the government is not paying attention, the defendant has proven adept at enlisting the help of others, as she did when she committed the Material Support Offense, to aid her in subverting the supervision of lawful authority and even in committing new crimes.

3

The defendant is no bystander in this story; she is its author.  For her repeated crimes, the United States Sentencing Guidelines advise a lengthy sentence within a range of 30 to 70 years' imprisonment.  The government respectfully requests that this Court be the first to hold the defendant accountable for her conduct by imposing a sentence within the Guidelines sentencing range.

I.    THE DEFENDANT'S OFFENSE AND RELEVANT CONDUCT

   A.    The Material Support Offense and the Defendant's Efforts to Cooperate (No. 17-CR-048)

   Beginning as early as January 2016 and continuing until her first arrest by the FBI in November 2016, Ceasar used numerous social media accounts to praise, promote and support the designated foreign terrorist organization the Islamic State of Iraq and al-Sham ("ISIS")[1] and its brutal acts of violence, including praising a terrorist attack conducted by an ISIS supporter in New York City.  She helped to disseminate ISIS propaganda, developed contacts with ISIS members overseas, and used her contacts with ISIS facilitators in an effort to help at least five people join ISIS abroad.[2]

   In addition to her role as an ISIS recruiter and facilitator, the defendant herself planned to travel abroad to join ISIS.  In her plea allocution for the Material Support Offense, she stated that she "intended to make [Hijrah] to Dawla to join the group," meaning ISIS.  Feb.

_____

[1]    The government also refers to ISIS herein as ISIL, which is the acronym for the Islamic State of Iraq and the Levant and is another name for the same terrorist organization.

[2]    The conduct underlying the Material Support Offense is detailed in the Probation Department's Second Revised Presentence Investigation Report ("PSR"), see PSR ¶¶ 8-43, and is extensively summarized in the government's sentencing letter dated June 17, 2019, which the government filed on the docket with limited redactions on June 25, 2019, Dkt. No. 17-CR-48, ECF No. 101.  Unredacted copies of the government's sentencing memorandum together with copies of the appended exhibits and the expert reports submitted by Dr. Lorenzo Vidino and forensic psychologist Dr. Kostas Katsavdakis can be provided to the Court upon request.

2017 Plea Tr. at 27. The defendant told the FBI following her arrest that in 2016 she obtained from Centre, an ISIS recruiter and facilitator located in Afghanistan to whom the defendant described herself as an "assistant," a visitation letter in support of her application for a visa to travel to Afghanistan that she ultimately obtained. And in 2016, the defendant communicated with Centre through an Internet messaging service about her plans to travel abroad to join ISIS. Further, in a conversation using the Internet messaging service with another individual in approximately September 2016, the defendant expressed her desire to travel to Afghanistan in November to "fight for Allah and be shaheeda" – a martyr.

Ceasar did attempt to travel abroad to join ISIS, but not initially to Afghanistan. On November 15, 2016, Ceasar was arrested at John F. Kennedy International Airport and charged by criminal complaint with attempting and conspiring to provide material support and resources to a foreign terrorist organization, to wit, ISIS, in violation of 18 U.S.C. § 2339B(a). The defendant's arrest prevented her from carrying out her plan to fly to Sweden, where she planned to marry Hasan Akgun, a Swedish national and fellow ISIS supporter, with whom the defendant planned to travel to ISIS-controlled territory.

In September 2019, months after the defendant had been sentenced on the Material Support and Obstruction Offenses, Akgun was arrested in the Philippines,[3] charged, along with others, and subsequently convicted of the Philippines offenses of Multiple Frustrated Murder and Multiple Attempted Murder for his role in at least one ISIS-related bombing there. In April 2024, while Akgun was in Philippines custody awaiting deportation to Sweden, he agreed to speak to the FBI about Ceasar, in the process identifying her by her middle name,

---

[3]     See "Philippine military says suspected Swedish militant arrested", AP News (Sept. 24, 2019), https://apnews.com/general-news-fd4abe386dd947709cc251dbe9fd0aed

"Amera," and one of the Facebook profiles under the alias "Rita Daoudii" that the defendant used during her commission of the Material Support Offense.

During his interview, Akgun explained that his planned marriage to the defendant had been arranged by a third party who had described the defendant to him as a practicing Muslim who supported "dawlah," referring to the Islamic State, and that after two to three months of communicating with the defendant through Facebook, WhatsApp and Telegram, he sent her money though Western Union and booked her a flight to Sweden through Turkey. According to Akgun, the defendant was "seriously looking to go to Syria" in order to live in a Muslim country with Shariah Law, and that the defendant wanted to live in "ISIS-controlled territory". More than that, Akgun stated that the defendant wanted to join ISIS in Syria specifically to "join the uprising" and "join the fight." The defendant told Akgun she wanted her children to be "mujahideen" and that she wanted Akgun to be a "mujahid" and to "join the fight." Akgun advised the FBI that he believed that if he had not been a mujahid it would have been a deal-breaker for the defendant.

Akgun explained that the defendant instructed him to join ISIS groups on the Telegram application and often sent him photos of ISIS propaganda included everything from pictures of happy families to photos of war and shooting. The defendant also sent him videos which included beheadings, told Akgun that she "enjoyed [ISIS] killing kuffar" and often told Akgun that she "want[ed] kuffar to be dead." Akgun told the FBI that the defendant called Americans kuffar and munafiq, or hypocrites. She said she could not live with them, and that she would do anything to support Islamic State, including give money, her life, or provide children. So clear was the defendant's devotion to ISIS, that when she failed to arrive at the

airport in Sweden, Akgun assumed that upon arriving in Turkey she had simply traveled directly to Syria instead of continuing on to Sweden.

Unbeknownst to Akgun, beginning on November 18, 2016, Ceasar was detained at the Metropolitan Detention Center in Brooklyn, New York ("MDC"). On February 13, 2017, pursuant to a cooperation agreement with the government, Ceasar pleaded guilty to one count of conspiracy to provide material support to a foreign terrorist organization (the "Material Support Offense"). See United States v. Ceasar, No. 17-CR-48. During her detailed allocution, Ceasar admitted to conspiring to provide material support to ISIS throughout 2016 and also that she herself planned to travel abroad and join ISIS, admitting that she "intended to make [Hijrah] to Dawla to join the group," using Arabic words frequently invoked by ISIS supporters to describe her plan to migrate to ISIS controlled territory ("hijrah") and to identify ISIS ("dawla"). See Feb. 2017 Plea Tr. at 27. Ceasar's use of numerous different types of social media and encrypted messaging applications – including multiple pseudonymous Facebook accounts – to find and communicate with other ISIS supporters was central to her commission of the Material Support Offense.

Pursuant to her cooperation agreement, Ceasar was debriefed extensively by the FBI and she provided information relevant to multiple investigations of ISIS supporters in the United States and abroad, and ISIS members operating within ISIS controlled territory overseas. However, no person was charged based on her cooperation and, as discussed in further detail below, Ceasar ultimately breached her cooperation agreement before her cooperation could yield any significant result.

B.    The Defendant's Bail Violations and the Obstruction Offense (No. 19-CR-117)

In April 2018, based on the claim that her health was deteriorating at the MDC, Ceasar was released on bail subject to stringent conditions of release designed to prevent her

from contacting members of terrorist organizations and their supporters, to limit her access to electronic devices and the Internet, and to permit Pretrial Services and the FBI to monitor her communications while on release.

During the bail hearing prior to her release, Magistrate Judge Levy asked Ceasar how she could be trusted to follow the proposed bail conditions and inquired, "How can you give everyone in the room some comfort that you will not be using any electronic devices at this point," to which Ceasar replied:

> For me, I know myself that I won't make trouble to make me come back or violate anything. I will occupy myself so I won't be bored or anything like that and I will obey the rules that I have to do until I am, you know, free or but I'm a person that I'm going to -- for me, what I say is true. I'm an honest person and I am going to do the best that I can and I will prevail. So I hope that y'all can trust me, and if y'all don't trust me as I show y'all – I will show y'all that I will be honest in what I do.

April 27, 2017 Hr'g Tr. 36-37.

Within two months, Ceasar had violated her cooperation agreement and her conditions of release. As Judge Weinstein later found at sentencing, while on presentence release Ceasar committed "widespread violations of her release conditions" and

> [i]n addition to performing online searches for known ISIL affiliates and news of the organization's activities, [] [Ceasar] created at least three pseudonymous social media accounts and used them to contact or attempt to contact at least seven people she had previously identified to the FBI as supporting ISIL or other extremist groups. [] She also contacted or attempted to contact other individuals about whom she had not previously provided information to the government, but who had expressed support for ISIL or were associated with ISIL supporters.

United States v. Ceasar, 388 F. Supp. 3d at 203 (citations omitted).

The government's extensive investigation of Ceasar's activities during the brief period in which she had been released on bail uncovered, and Judge Weinstein found at

sentencing, that Ceasar had "deleted at least 1,000 Facebook messages and at least 1,000 text messages, as well as emails, audio files, and images," and that she "used Facebook to tell at least eight people that she intended to delete her Facebook accounts and provided many of these people alternative means of contacting her" the day before she was to meet with her Pretrial Services Officer.  Id. at 204.  In a further effort to conceal her conduct, Ceasar "instructed others with whom she was communicating via Facebook to delete their Facebook messages with her." Id.

While the full extent of Ceasar's activities on presentence release are not known because she deleted so many of her communications, the government's review of the communications that Ceasar was unable to delete revealed, and Judge Weinstein found, that "Ceasar's messages with ISIL supporters from this time period indicate that she believed that her conduct leading to conviction for conspiring to provide material support to ISIL was not wrong." Id.  Among those communications were statements in which Ceasar attributed her arrest to the actions of "spies" and rejected responsibility for her criminal conduct by asserting that "'I didn't do anything wrong under Islam but stand up for my deen and got arrested for what I believe in . . . .'"  Id. (citation omitted).  As Dr. Lorenzo Vidino explained in the report submitted to the Court in connection with Ceasar's first sentencing hearing, "'Deen' is an Arabic term for religion which has been interpreted narrowly by jihadists, 'to refer explicitly to their in-group, and [they] often use *deen* to express following and adhering to 'the right path' represented by their group's interpretation of Islam.'"  Id. (quoting Vidino Report at 23 (italics in original)).

Notably, Ceasar's violation of her presentence release conditions came while she was receiving counseling from Dr. Katherine Porterfield, which was arranged by the Federal Defenders.

Following the revocation of Ceasar's bail in June 2018 and her return to custody pending sentencing, the government interviewed Ceasar in the presence of her attorneys in January 2019 about her conduct while on presentence release between April and June 2018.  As Judge Weinstein found at her first sentencing hearing, Ceasar lied repeatedly to the government during this interview.  She lied about seeking out and consuming ISIS propaganda, lied about downloading an application to her phone to obtain ISIS news, lied about creating a pseudonymous email account and Facebook account, and lied about communicating with ISIS members and supporters.  See Ceasar, 388 F. Supp. 3d at 204-05.  Ceasar also "lied about her use of the name 'Umm Nutella,' the *nom de guerre* she used to identify herself among ISIL supporters throughout 2016," adamantly denying that she had used that name "because it would mean she was 'back supporting ISIS,'" notwithstanding the fact that records obtained by the government indicated "that she at least twice identified herself with this pseudonym in messages while on presentence release."  Id. (citations omitted).

On March 7, 2019, as a result of her actions while on bail pending sentencing, Ceasar pleaded guilty to one count of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(1) (the "Obstruction Offense").  See United States v. Ceasar, No. 19-CR-117.  As part of her allocution, Ceasar also admitted that she lied to the government in the January 2019 interview, and that she had committed the Obstruction Offense while released on bail, triggering an additional mandatory consecutive punishment, under 18 U.S.C. § 3147(1).  Because Ceasar committed multiple material breaches of her cooperation agreement while on presentence release, the government was released from its obligations under the cooperation agreement.

C.    The Defendant's Consolidated Sentencing on the Material Support Offense and the Obstruction Offense

1.    The Sentencing Hearing

From June 24 to June 26, 2019, Judge Weinstein conducted a three-day consolidated sentencing hearing for both the Material Support Offense and the Obstruction Offense that included expert testimony from two expert witnesses called by the government, and three expert witnesses called by the defense.

Dr. Vidino, a researcher who studies jihadist groups and the process of disengagement from those groups and deradicalization, submitted an expert report and testified for the government to provide background regarding ISIS and other jihadist groups to assist the Court in assessing the significance of Ceasar's Material Support Offense and to understand the jihadist language and concepts that Ceasar used in her communications during the commission of the Material Support Offense and the Obstruction Offense, as well as upon her return to custody. Dr. Vidino opined that "Ceasar's frequent explanation that she was prosecuted because of her religion, which is also present in Ceasar's messages while on presentence release, indicates that she retains the mindset of an ISIL supporter." Ceasar, 388 F. Supp. 3d at 208. Dr. Vidino also testified that there are no disengagement and deradicalization programs in the United States that could assist a radicalized adherent of jihadist ideology to disengage from ISIS and to deradicalize. See id. at 207.

Dr. Kostas Katsavdakis, a clinical and forensic psychologist, testified regarding the results of a threat assessment he had performed based on meetings with the defendant and his review of relevant records. See id. at 208-12. Dr. Katsavdakis opined "that Ceasar poses a moderate risk for violent/extremist beliefs, further radicalization, and possible acts." Id. at 212.

11

Defense expert Dr. Marc Sageman, a former CIA officer and forensic psychiatrist, opined that Ceasar's support of ISIS was an "emotional affiliation" instead of an ideological commitment to its cause, and that, because ISIS no longer held territory, there was no risk that Ceasar would re-offend or commit an act of violence.  See id. at 213-14.[4]

Defense expert Dr. Katherine Porterfield, a psychiatrist who met relatively frequently with Ceasar following her arrest in November 2016 through the date of sentencing, opined that Ceasar was drawn to ISIS as a result of Ceasar's experience with past trauma, and that her "behavior while on presentence release was typical of the behavior survivors of trauma exhibit during recovery."  See id. at 214-15.  Dr. Porterfield opined that "relapse" and "mistake" is a common feature of the "wavy line" trajectory of recovery from past trauma.  See id.  Dr. Porterfield attributed Ceasar's commission of the Obstruction Offense and her reengagement with ISIS supporters while on presentence release to Ceasar having been "released without enough planning and without enough support," and she further opined that Ceasar "could not handle the stress at that point of being out, not having enough treatment, and not having enough of a community."  Id. at 215-16 (quoting Dr. Porterfield, Sent. Tr. 248:1-249:4).  Dr. Porterfield acknowledged during her testimony that she had been meeting with Ceasar during the period in which Ceasar committed the Obstruction Offense and that Ceasar had deceived her by not disclosing her reengagement with ISIS supporters.  Sent. Tr. 268:20-25.  Despite this, Dr. Porterfield opined that Ceasar does not have a continuing commitment to ISIS, and that further

---

[4]     Dr. Sageman's opinion, though flawed from the outset, has aged particularly poorly. Indeed, and as particularly relevant to Ceasar's sentencing hearing, ISIS Khorasan Province ("ISIS-K") has gained ground in Afghanistan and carried out the terrorist attack that killed U.S. Marines at Hamid Karzai International Airport in August 2021 just as Ceasar attempted to flee the United States.

imprisonment would cause Ceasar harm because she suffers from Post-Traumatic Stress Disorder and requires trauma-focused treatment that Dr. Porterfield claimed Ceasar could not receive in prison.  See Ceasar, 388 F. Supp. 3d at 216-17.

Defense witness Ms. Daisy Khan, a self-taught expert in counter-extremism and women in Islam, opined, based on six meetings with Ceasar (see Sent. Tr. 162:2-5), "that Ceasar is no longer committed to ISIL and that she is regretful of her conduct," Ceasar, 388 F. Supp. 3d at 213, and "that Ceasar's attraction to ISIL was personal, not ideological.  Ceasar was motivated, Khan [said], by the social isolation and trauma in her life, as well as her desire for purpose in life," id. at 212 (citations omitted).

> Khan went on to testify that [Ceasar] would benefit from access to a supportive and understanding community, as well as from continued psychiatric treatment. She suggested piloting a rehabilitation program in which [Ceasar] would be placed in a residential program, provided financial assistance, and given intensive mentoring and support in a Muslim community.

Id. 213 (citations omitted). But Ms. Khan, Judge Weinstein acknowledged, "ha[d] never designed or used such a program" id., and during her testimony Ms. Khan admitted that she had "no official training in this area at all," and no "facility to take [Ceasar] in."  Sent. Tr. 178:1-3, 20-22.  Instead, Ms. Khan volunteered to "mentor" Ceasar, a job that, as Ms. Khan described it, would involve "spiritual counseling" (Sent. Tr. 179:16-19), and "would require [them] spending time together . . . at least maybe once a week."  Sent. Tr. 185:8-13.  Ms. Khan explained that she "would create a life plan for [Ceasar] as to what she needs to do with her life to reset her life in a different direction."  Id.

At the conclusion of the hearing, Ceasar addressed the Court directly (Sent. Tr. 339-344).  Regarding her past violations of the Court's trust, she stated:

> I do take responsibility for the many mistakes I made. I have been listening to what everyone has been saying in Court about me for

13

the last two days. I understand their concerns. I'm not blaming others, I'm blaming myself.

A year ago out on bail, I trusted my own judgment. The difference is now that I understand that I have terrible judgment and I can't trust what I think are good decisions. I now know the difference, which is that I know to seek proper help and advice only from the people like Dr. Porterfield, my attorneys and their team, and Daisy Khan.

I worked very hard to write this letter. What I want everyone to know is I was foolish and ignorant. I understand the actions I took were wrong, and I will never do it again. I'm not – I'm not going to engage with any terrorists or radical groups.

Sent. Tr. 340-41.

Ceasar then addressed her future compliance, telling Judge Weinstein:

I swear today to assure all of you I will comply to the rules and to get my priorities fulfilled. Even more so, I will build my life around positive people. To heal and to grow is freedom. I know now how to stop living unpredictably. I learned a lot from the journey of incarceration at times of being depressed and despair.

Id. at 343.

2.  Judge Weinstein's Sentencing Determination

Following the testimony of the government and defense witnesses, and Ceasar's

address to the Court, Judge Weinstein concluded that Ceasar "ha[d] moved substantially towards

rejection of ISIL and now abjures the terrorist ideology." Sent. Tr. 350:14-16. In both his oral

statement of reasons and in his more extensive published opinion, Judge Weinstein emphasized

the traumatic circumstances of Ceasar's life that, in the views of Ceasar's experts, caused Ceasar

to seek "ISIL as a way to deal with her harsh circumstances and because of clinical issues

affecting her judgment." Ceasar, 388 F. Supp. 3d at 220; Sent Tr. 350:17-22.

Judge Weinstein emphasized his concern "that a lengthy term of incarceration

during which her medical needs are not fully met would be extremely harmful to Ceasar's

development as a productive member of society," and that "[c]ontinued separation of Ceasar from a supportive, non-incarcerated community will also be detrimental to the goal of rehabilitation." Ceasar, 388 F. Supp. 3d at 222. Thus, Judge Weinstein described his "ideal sentence" of placing Ceasar "in a deradicalization or disengagement program with provision for intensive educational, emotional, and economic support to address her childhood trauma and its attendant results," even as he acknowledged that "no such satisfactory general program exists in the United States." Id. at 220.

Judge Weinstein found also that "[w]ithout access to treatment while incarcerated or on supervised release, [Ceasar] will likely remain an unrehabilitated supporter of ISIL and a continuing danger to the United States." Id. at 196. Judge Weinstein placed his hope for Ceasar's rehabilitation on "a program of intensive treatment and support for the term of her supervision after her incarceration" that "Ceasar's counsel and the Probation Department are developing," which Judge Weinstein indicated "should begin in prison and connect seamlessly with control and assistance by Probation." Id.

Thus, although Ceasar's undisputed Sentencing Guidelines range was 360 to 600 months' imprisonment (Sent. Tr. 348:22-349:6), Judge Weinstein imposed a total sentence of 48 months' imprisonment, apportioned as follows: 46 months for the Material Support Offense, one month for the Obstruction Offense and one month pursuant to 18 U.S.C. § 3147 because Ceasar committed the second offense while on bail, to be followed by a total of eight years' supervised release subject to conditions similar to those Ceasar had violated on presentence release. (Sent. Tr. 349:23, 355:19-360:11).

15

The stringent conditions of supervised release imposed on the defendant at her original sentencing in 2019 provided that the defendant:

- "shall not associate in person, through mail, electronic mail, the Internet, social media, telephone, or any other means with any individual known by her to be affiliated with any terrorism-related groups, organized crime groups, gangs or any other criminal enterprise; nor shall she frequent any establishment, or other locale where these groups may meet, pursuant, but not limited to, a prohibition list provided by the Probation Department";

- "shall cooperate with the Probation Department's Computer and Internet Monitoring program. Cooperation shall include, but not be limited to, identifying computer systems, Internet capable devices, and/or similar electronic devices she has access to, and allowing the installation of monitoring software/hardware on said devices, at her expense to the extent she can reasonably pay. Defendant may be limited to possessing only one personal Internet capable device, to facilitate the Probation Department's ability to effectively monitor her Internet related activities";

- "shall permit random examinations of said computer systems, Internet capable devices, and similar electronic devices, and related computer peripherals, such as CD's, under her control";

- "agrees that the Probation Department may, in its discretion, share information obtained during its monitoring of her phone, electronic, Internet capable, and/or computer systems, communications accounts, and devices with the FBI in order for the FBI to assist the Probation Department in evaluating such information as part of assessing Defendant's compliance with the terms of her supervision"; and

- "shall submit her person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(l)), other electronic communications or data storage devices or media, or office, to a search conducted by a female United States Probation officer. Failure to submit to a search may be grounds for revocation of release. Defendant shall warn any other occupants of her home that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that Defendant has violated a condition of her supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner."

The purpose of these conditions was to ensure that the defendant's use of electronic communications services and the Internet would be monitored, so that Probation—and the FBI—

would know if she attempted to resume contact with supporters and followers of extremist groups and movements, as she had already done once before while released on bail.

On December 13, 2019, the government filed its principal appellate brief, arguing that Ceasar's sentence—87 percent below the low-end of the applicable Guidelines range—was substantively unreasonable. See Appellant's Br., United States v. Ceasar, No. 19-2881(L), ECF No. 31 (2d Cir. Dec. 13, 2019). The Second Circuit heard oral argument on the case in October 2020, and as discussed below, vacated Ceasar's sentence as substantively unreasonable and remanded to this Court for resentencing on the Material Support Offense and the Obstruction Offense in August 2021.

D.     The Defendant's Misconduct While Incarcerated at FCI Tallahassee

In the year following Judge Weinstein's conclusion at her June 2019 sentencing that Ceasar "ha[d] moved substantially towards rejection of ISIL and now abjures the terrorist ideology" (Sent. Tr. 350:14-16), and while the government's appeal wound its way through the appellate process, the defendant continued her well-established pattern of circumventing restrictions on her communications in prison and continued to use extremist language and refer to jihadist concepts in her communications with others while incarcerated.

1.     The Defendant's Continued Circumvention of BOP Regulations While Incarcerated

On May 6, 2020, just months before she completed serving her 48-month term of imprisonment, Ceasar was caught violating BOP policy, this time regarding inmate phone calls. Specifically, Ceasar participated in a prohibited three-way phone call by dialing a person on her approved list of contacts and then connecting to a third associate in a different jail who was not on Ceasar's approved contact list. BOP records reflect that Ceasar subsequently admitted to the violation and lost 27 days of good time credit, delaying her release from prison. The FBI's

17

subsequent review of Ceasar's jail calls from 2019 and 2020 showed that she had engaged in similar three-way phone calls in violation of BOP regulations on several other occasions.

In addition, toward the end of her prison sentence, Ceasar made multiple recorded statements evincing her intention to evade Court-ordered monitoring of her electronic communications while on supervised release.  For example, during a May 23, 2020 recorded prison call with an associate, Ceasar discussed buying a cell phone during her planned bus ride from Tallahassee to New York, and explained that she needed an Internet-capable phone so she could download WhatsApp and other free applications.[5]  Ceasar was familiar with WhatsApp because it was one of the applications she had used in 2016 to commit the Material Support Offense.  Ceasar had used WhatsApp to communicate with an associate whom, after her November 2016 arrest, Ceasar identified to the government as an ISIS supporter with bombmaking skills who spoke at length to Ceasar about his/her desire to conduct a violent attack.  Ceasar's downloading and use of WhatsApp prior to her return to New York would have, by definition, constituted unmonitored electronic communications in violation of her conditions of release.

During a June 22, 2020 recorded prison call, Ceasar told another associate, "I'm gonna get a phone and stuff we can chat the whole way," referring to her bus ride from Florida to New York.  On July 22, 2020, days before her release, Ceasar again told an associate during a recorded prison call that she intended to buy and begin using an Internet-enabled cell phone immediately upon release from prison – and thus before Probation could begin monitoring the device as required by her conditions of supervised release.  Specifically, Ceasar detailed her

---

[5]      WhatsApp is an online communication platform that advertises, among other things, fully encrypted text messaging.

plans to buy a new phone with WiFi service at a rest stop on her bus ride from Florida to New York City immediately after her release from FCI Tallahassee.

> 2.     The Defendant's Continued Affinity for Violent Extremist Ideology and Association with Supporters of Violent Extremist Beliefs While Incarcerated

While in BOP custody, the defendant also continued her well-established pattern of circumventing restrictions on her access to and monitoring of her communications. After her sentencing in June 2019, and in addition to her continued violations of BOP rules restricting her access to only monitored communications, Ceasar's communications with others evinced her continued support for ISIS and its violent ideology, and she continued associating with others who espoused violent extremist beliefs, despite her claim at sentencing that she had disavowed such beliefs.

For example, in April 2020, an inmate ("Inmate-1") incarcerated with Ceasar at FCI Tallahassee filed a complaint report in which Inmate-1 accused Ceasar of bumping her.  In the same report, as well as in a subsequent interview with the FBI, Inmate-1 reported hearing Ceasar openly express her support for ISIS.   Inmate-1 reported that on one occasion, Inmate-1 and Ceasar discussed why Ceasar was incarcerated, during which Ceasar stated that she was "here for ISIS, I praise ISIS" and that the "FBI caught me."  Inmate-1 further reported that Ceasar also told Inmate-1, "I root for ISIS, you root for the USA."  Inmate-1 further reported that Inmate-1 did not witness Ceasar attempt to recruit anyone to join ISIS, but that Ceasar was openly supportive of the terrorist group and frequently spoke about it.

Similarly, in recorded prison phone calls in April and May 2020, Ceasar was recorded referring to others as "kuffar" which, as discussed above and in the government's prior filings, is a term she used frequently during her commission of the Material Support Offense and the Obstruction Offense to refer to those who did not share ISIS's violent extremist ideology.

E.    The Defendant's Violations of the Conditions of Her Supervised Release and Related Misconduct

While the government's appeal of the defendant's sentence was pending, the defendant completed her 48-month term of imprisonment and was released to begin her eight-year term of supervision from FCI Tallahassee on July 28, 2020.  She returned to New York City by bus the next day and began violating her conditions of supervised release almost immediately.  As a result, in addition to Probation's Court-directed monitoring of her conduct, the FBI and the United States Attorney's Office commenced an investigation into Ceasar's post-release activities.  As part of the investigation, the government sought and obtained numerous business records related to Ceasar's online activities.  Additionally, on October 16, 2020, just three days before the Court of Appeal heard oral argument on the government's appeal of the defendant's sentence, the FBI seized Ceasar's cellular phone pursuant to a search warrant issued by a magistrate judge in the Southern District of New York.  The FBI also reviewed more than 110,000 screenshots taken of Ceasar's cellular phone and stored as part of Probation's court-ordered electronic monitoring of Ceasar's phone.[6]

The government's investigation revealed that from the moment of her release to supervision by the Probation Department in July 28, 2020, until she eventually fled what she believed to be this Court's certain decision to remand her on August 25, 2021, the defendant repeatedly, and flagrantly, violated the conditions of release imposed by Judge Weinstein to enable the Probation Department and the government to monitor the defendant's activity on the Internet.  And even as Probation and the government reported the defendant's continuing non-

---

[6]    The phone monitoring software installed by Probation on Ceasar's cellular phone as part of her conditions of supervised release recorded screenshots of the phone at ten-second intervals while the phone was being used.

compliance to the Court in status reports and letters documenting the defendant's lies and deceit, she continued to disobey the conditions of her supervised release.

1.    VOSR Charges One through Three: August 13-October 16, 2020

Just three months after her release, on November 2, 2020, the Probation Department filed a Violation of Supervised Release ("VOSR") Report charging Ceasar with three violations of the conditions of her supervised release: (1) between August 13, 2020, and October 16, 2020, Ceasar downloaded and accessed unreported applications, including social media accounts, to her smartphone; (2) between August 13, 2020, and October 16, 2020, Ceasar failed to provide account identifiers and passwords for accounts and applications downloaded and accessed on her cellular phone; and (3) between August 26, 2020, and September 25, 2020, Ceasar corresponded with individuals known to have felony convictions.

The defendant was arraigned on the VOSR charges on November 20, 2020, and released under the Bail Reform Act with instructions to comply with her conditions of supervised release. Following the defendant's arraignment on VOSR Charges One through Three, the Court issued an order extending the term of the defendant's location monitoring and home confinement condition of supervision through the date of Ceasar's sentencing on the VOSRs. The Court also made clear that following the seizure of the defendant's approved smartphone on October 16, 2020, the defendant was permitted to access the Internet only in the presence of her defense counsel or their staff in coordination and with the knowledge of the Probation Department.

Charges One and Two of the November 2, 2020 VOSR Report identified a host of applications that the defendant had downloaded to her phone without reporting them or providing her login credentials to Probation between August 13, 2020, and October 16, 2020. See Nov. 2, 2020 VOSR Report at 9-12. Those applications included Facebook, which the defendant had used extensively during the commission of the Material Support and Obstruction

21

Offenses, and several applications used for transferring money or engaging in encrypted communications, including CashApp, Western Union, Signal, Viber, and TextNow, and the BOP's CorrLinks app, which allows users to have calls and video chats with inmates at BOP facilities.  See id.  Charge Three of the VOSR Report identified two incarcerated and convicted felons with whom the defendant had communicated without first obtaining permission of her Probation Officer.  See id. at 12.  At the time of the VOSR Report, the Probation Department noted that the conduct was "extremely troubling" in that it reflected that the defendant "continues to demonstrate a lack of responsibility for her actions and is returning once again to similar conduct as the instant offense."  See id. at 16.  Probation recommended that the Court revoke the defendant's supervised release and sentence her to serve a term of 12 months' imprisonment followed by 10 years' supervised release.  See id. at 17.

The defendant pleaded guilty to Charges One and Three of the November 2, 2020 VOSR Report on January 5, 2021, with the government agreeing to dismiss Charge Two at sentencing.  Jan. 5, 2021 Tr. at 12.  The government further noted that "[t]he government is continuing to investigate Ms. Ceasar's conduct while on release and in order to give a full picture to the Court" at the defendant's sentencing on the VOSR.  See id.

2.    The Additional Misconduct Identified in the Government's March 29, 2021 VOSR Sentencing Letter

On March 29, 2021, the government filed a letter memorandum in support of sentencing the defendant for her continuing violations of supervised release ("March 29 Letter," No. 17-CR-48, ECF Nos. 139 (under seal) and 140 (redacted)).[7]  As detailed below and in the

---

[7]    The March 29 Letter included numerous citations to specific screenshots taken by the computer monitoring application installed on the Defendant's phone as evidence for the assertions in the government's letter, together with an appendix of the cited screenshots that was

March 29 Letter, the government explained that its investigation had revealed that, in addition to the supervised release violations to which the defendant pleaded guilty in January 2021, following her release in July 2020, the defendant had (1) re-contacted at least one individual she previously identified as a supporter of Islamic extremism and then attempted to cover-up that contact; (2) received money from a foreign-based individual who admitted to supporting ISIS, and sought to conceal her communications with this individual; (3) without Probation's knowledge or approval, installed and used numerous social media and electronic communications applications in addition to those cited in the November 2, 2020 VOSR Report; (4) deleted and attempted to conceal from Probation and the Court significant amounts of electronic evidence; (5) used Islamic extremist terminology; and (6) deceived, lied, and omitted material information when communicating with her Probation officer.

As the government subsequently explained to the Court at a status conference on March 30, 2021, the investigation summarized in the March 29 Letter had required months of work because the limited effectiveness of the monitoring software used to monitor the defendant's smartphone forced the FBI and the defendant's probation officer to manually review 110,000 screenshots the software had taken of the defendant's phone at ten-second intervals.  See Mar. 30, 2021 Tr. at 15-23.  The government expressed concern about how the defendant's use of Internet-enabled electronic devices could be effectively monitored given the extreme burden that reviewing screenshots of the defendant's had placed on the Probation Department and the FBI to monitor the defendant's use of the Internet.  See id.  The government also highlighted

---

provided to the Court and to defense counsel. The government has not duplicated those citations and references in this memorandum, but can provide additional courtesy copies of the March 29 Letter and its attachments to the Court upon request.

evidence that Ceasar had been using Internet-enabled electronic devices without monitoring software since the government had obtained a search warrant for the defendant's Probation-approved cell phone on October 16, 2020.  See Mar. 30, 2021 Tr. at 15, 24-30.

        i.      The Defendant Recontacted a Known Islamic Extremist

The government's investigation revealed that almost immediately after her release from FCI Tallahassee, Ceasar violated the special condition of supervised release barring her from associating "in person, through mail, electronic mail, the Internet, social media, telephone, or any other means with any individual known by her to be affiliated with any terrorism-related groups, organized crime groups, gangs or any other criminal enterprise."  Because of restrictions imposed by public health authorities to combat the COVID-19 pandemic, upon her arrival in New York on July 29, 2020, Ceasar underwent a mandatory fourteen-day quarantine at a hotel in Queens, New York.  Ceasar did not have access to a cellular phone during this period.  However, an analysis of the hotel's phone records indicates that Ceasar used a landline to make approximately 148 outgoing calls for a total of approximately 24 hours of unmonitored talk time.[8]

Phone records show that on August 9, 2020, a landline belonging to the hotel twice called the phone number of an associate whom Ceasar previously identified to the FBI as a Taliban supporter located in the United States who had expressed a desire to travel to jihadist-controlled territory (identified in the government's June 17, 2019 sentencing submission and hereinafter as "Facebook User 2").  Ceasar's first call with Facebook User 2 on August 9, 2020

---

[8]    Records indicate that approximately 20 of the calls were made to defense counsel or their staff.

lasted approximately eleven minutes and the second lasted under two minutes.  Ceasar did not report either call to Probation.

By way of background, while on bail pending sentencing in June 2018, and despite her release conditions explicitly barring her from contacting anyone with extremist beliefs, Ceasar used one of her pseudonymous Facebook Accounts to contact and communicate with Facebook User 2.  In her 2018 messages to Facebook User 2, Ceasar revealed her cooperation with law enforcement after her 2017 arrest.  As detailed at Ceasar's sentencing, Ceasar also attempted to cover up her contacts with Facebook User 2 in 2018 by deleting their Facebook exchanges.  The government ultimately recovered some of Ceasar's and Facebook User 2's exchanges only after executing a search warrant on an account controlled by Facebook User 2.  Ceasar's deletion of communications with Facebook User 2 was part of the factual basis for the Obstruction Offense.

After completing quarantine on August 12, 2020, Ceasar moved into Hope House, which provides transitional housing for convicted felons, in the Bronx.  Hope House was the same location where Ceasar resided while released on bail pending sentencing in 2018 when she committed the violations of her conditions of release that triggered her bail revocation and engaged in the conduct that formed the basis for the Obstruction Offense.  That same day, Ceasar obtained an internet-enabled smart cellular phone provided by her defense counsel.  Ceasar promptly informed her Probation officer and Probation installed the requisite monitoring software on the phone on August 13, 2020.  Probation again instructed Ceasar, consistent with her conditions of release, that she must notify Probation of her creation of any social media account and provide the login information for each such account.  Ceasar again acknowledged her understanding of these conditions.

Records show that on August 13, 2020, the day after she received her cellular phone, Ceasar put Facebook User 2's phone number into the phone's contacts under the pseudonymous name "Umm Qutbi." To the government's knowledge, Umm Qutbi is not a name Ceasar previously used for Facebook User 2, nor is the name a known social media moniker for Facebook User 2. Rather, Ceasar appears to have chosen the name to conceal her communications with Facebook User 2 from Probation, the government and the Court. After creating the contact, Ceasar used her phone to text Facebook User 2 stating, in sum and substance, "My phone number."

Between August 13 and August 19, 2020, Ceasar and Facebook User 2 exchanged approximately 40 text messages. During these exchanges, Facebook User 2 asked Ceasar to "clarify what happened with you on how you were released from prison and put back in and now out again??" and stated that "Its just a confusing situation and as you know my husband is familiar with the federal system. It's a sunnah to bring clarity to your situation as not to leave anything to suspicion." Facebook User 2 also asked Ceasar about her specific counts of conviction and referencing the United States Code sections for providing material support to terrorists and providing material support or resources to designated foreign terrorist organizations, asked, "Were you charged with 18 U.S.C 2339A or 2339B?" Records show that, shortly thereafter, Ceasar and Facebook User 2 engaged in an approximately 17-minute phone call, the content of which is unknown to the government.

Ceasar never informed Probation of any of her contacts with Facebook User 2. Additionally, as discussed in greater detail below, the government's investigation revealed that Ceasar subsequently deleted from her cellular phone her text communications with Facebook

User 2 as well as Facebook User 2's number from her phone contacts, all in an apparent attempt to conceal the communications.

ii.     <u>The Defendant's Efforts to Deceive Probation Regarding<br>Her Use of Social Media Applications</u>

Charge One in the November 2, 2020 VOSR Report listed 20 applications Ceasar downloaded to her cellular phone between August 13 and October 16, 2020 (the day the FBI seized her phone), all of which she failed to disclose to Probation in violation of her release conditions.  <u>See</u> Nov. 2, 2020 VOSR Report at 11-12.  The government's investigation, including a review of records from Probation's phone monitoring software and a review of Ceasar's cellular phone pursuant to the search warrant, revealed that in addition to the applications identified in the VOSR Report, Ceasar in fact installed and registered numerous other electronic service communications accounts without informing Probation of the accounts or providing her login credentials, as required.  In several instances, Ceasar downloaded and used such applications shortly before communicating with her probation officer and yet still failed to disclose them, while selectively disclosing certain other accounts.

On August 12, 2020, Ceasar, using her full name, registered the Gmail address "sinmyahameraceasar@gmail.com" (the "sinmyahameraceasar Gmail Account") and provided the email address to Probation, consistent with her conditions of release.  Facebook records show that the next day, August 13, 2020, Ceasar used her sinmyahameraceasar Gmail Account to register a new Facebook account with the display name Amera Ceasar (the "Amera Ceasar FB Account").  On or about September 15, 2020, Facebook disabled the Amera Ceasar FB Account

27

because the account violated Facebook's terms of service.[9]  At no point prior to Facebook

disabling the account on September 15, 2020 did Ceasar inform her probation officer – as she

was required to do – that she had created the Amera Ceasar FB Account.

But Ceasar did not just fail to disclose the Facebook account to Probation; she lied

to and misled her probation officer about it.  Specifically, records show that on August 13, 2020,

Ceasar registered a TikTok account.[10]  Approximately one hour later, Ceasar registered the

Amera Ceasar FB Account.  Later that same day, Ceasar disclosed to her probation officer the

creation of the TikTok account but omitted any mention of the Facebook account she had already

registered and, when asked about other social media applications, explicitly denied to her

probation officer that she had created any social media accounts other than the TikTok account.

On August 16, 2020, days after she had already registered the Amera Ceasar FB

Account, Ceasar wrote to her probation officer and asked about the possibility of creating a

Facebook account, writing "I am trying to figure out can I make a FB page just for my music…"

and explaining that she would be using the page to further her music career.  Ceasar's probation

officer responded:

> You are allowed to have social media as long as you advise as to
> what you have and continue to provide the username and password
> as you have been doing.  I caution you to have FB if you don't feel
> comfortable with it as I wouldn't want you in a position that may
> put you in a bad space...

---

[9]     The government is not aware what specific term(s) of service Ceasar violated.
The FBI discovered the existence of the Amera Ceasar FB Account on August 20, 2020, at
which point a records preservation request was transmitted to Facebook.  Accordingly, the
government is unaware of the extent of Ceasar's use of the Amera Ceasar FB Account between
August 13 and Facebook's receipt of the preservation request on August 20, 2020.

[10]    TikTok is a video-sharing social networking service used to make and share a
variety of short-form videos.

Id. at 63.

Later that evening, Ceasar wrote back to her probation officer informing him, among other things, that "the music producer keep telling me I need to have it," referring to Facebook, "But I'm like I have bad flashbacks" and that "I made my mind up I don't want it FB right now I just will music recording send it to emails."  By this time Ceasar had already created the Amera Ceasar FB Account without informing her probation officer and, as indicated above, denied having such an account on August 13, 2020.

   iii. The Defendant's Use of Undisclosed Electronic Communication Applications to Communicate With and Solicit Funding From an ISIS Supporter

In addition to the undisclosed applications identified in the November 2, 2020 VOSR Report, Ceasar also downloaded without notifying Probation the Athan application, which is a phone-based app associated with the social media site "IslamicFinder."[11]  As detailed below, the defendant then used the application to connect with an apparent ISIS supporter located in a different country and obtain money from him, while actively misleading her probation officer about the identity and her relationship with the person who was the source of the funds.

---

[11] The website at www.islamicfinder.org, which is self-titled "IslamicFinder: Info about Islam and Muslim Mosques (Masjids), Calendars, & Prayer times," is a directory of Islamic information on the Internet.  The site's stated mission "is to help Muslims around the globe navigate their daily lives; we offer innovative products and services that are truly world-class and delight our users."  The site, available in Arabic and English, also provides a search engine for finding a local Islamic center, mosque, and/or organization and prayer times near a city or zip code within the U.S. or in another country.  Information from IslamicFinder is provided by way of links or articles from other websites and separated into topics. The website also offers social media forums separated into five categories for U.S.-based users: "Ask a Muslim"; "Dua Requests"; "Halal Foods"; "New York" and "Muslims in USA."  IslamicFinder also offers a cellular phone application version of their website called "Athan."

Ceasar downloaded the Athan application to her cellular phone on August 17, 2020. Records show that Ceasar then logged into the Athan application more than 150 times in August and September 2020. After registering the account, Ceasar posted messages on the site soliciting money and seeking a "Muslim sister" to socialize with in New York City. In one post, Ceasar used the derogatory term "kufaar" to refer to non-Muslims which, as noted above, she repeatedly used while committing her Material Support Offense in 2016 – writing:

> That's one thing about Muslim community they want to judge people past and not help them out but most people went through a lot of trauma... And they want to know why people go to kufaar and get help better than the Muslim community it's shame and prophet Mohammed saws said that was going to happen #AllahistheQadi[12]

Records from Ceasar's cellular phone show that beginning in September 2020, Ceasar used Athan to communicate with an individual ("Person-1") who resided in a foreign country ("Country-1").

The government has investigated Person-1's background and learned that during a May 2016 interview with law enforcement personnel, Person-1 stated, in sum and substance, that he came to Country-1 in 1995 as a refugee after fighting in the Bosnian Army, and that he spent time as a prisoner of war after being captured by Croatian forces. Person-1 described himself as a good Muslim and stated that he supports ISIS as the current group in power, stating "ISIS are the group to follow and should be followed by all good Muslims." Although Person-1 stated that he is grateful for what Country-1 has provided him and does not want to get physically involved, he also stated that ISIS are able to justify their attacks overseas and if God orders the attacks then they are justified. Person-1 further stated he has health issues and alluded to mental health issues, possibly PTSD, resulting from his war experience.

---

[12]    All spelling as reflected in original message.

On September 6, 2020, Ceasar "liked" a post by Person-1 on the Athan application. Person-1's public-facing user profile on Athan is "Mumin" and his profile photo is the black flag of ISIS, as seen here:



As context, Person-1's post "liked" by Ceasar read: "2.42-And do not mix the truth with falsehood or conceal the truth while you know [it]… next is very sad; https://sites.google.com/site/jonelya/traitors The state of the Ummah today: https://tawheedulema.wordpress.com/". Ceasar then wrote a comment soliciting donations for food and included her phone number and email address.

Person-1's Athan profile with the ISIS flag was visible to Ceasar each time she interacted with Person-1 on the application. Additionally, by the time she "liked" his post on September 6, 2020, Ceasar had already viewed one post in which Person-1, under the profile name Mumin with the ISIS flag, provided a link to a website describing "Arab rulers who helped take over Jerusalem" as traitors, and another in which Person-1 wrote "the real truth about hijra"[13] and linked to a YouTube site which is no longer available to view on YouTube.

---

[13]    As with many Arabic terms coopted by Islamic extremists, hijra has both a benign and derogatory use. As Dr. Vidino explained in advance of Ceasar's sentencing, "[f]or jihadists, hijrah is a term used predominantly for supporters/followers in countries outside the operational zones of the jihadist group to travel to those zones and join the group. To make hijrah is to travel from a 'land of disbelief' [] to a territory where a jihadist group has created or seeks to create

After their initial interaction on Athan on September 6, 2020, Ceasar and Person-1 exchanged emails in which Person-1 offered to help Ceasar. On September 7, 2020, Person-1 invited Ceasar to use Signal, the encrypted messaging application. Ceasar then installed the Signal application on her cellular phone and created an account which she never disclosed to Probation. Ceasar then used Signal to provide her banking information to Person-1.

On the evening of September 7, 2020, Ceasar and Person-1 exchanged multiple messages confirming Person-1's transfer of approximately $500 to Ceasar via Western Union, including sending her the tracking information for the transfer. Approximately one minute later, at approximately 10:02 p.m., Ceasar texted her probation officer and falsely told him that "Hey my family sent me western union money tomorrow can i pick it up please." Ceasar's probation officer did not respond that night. The next morning, September 8, 2020, Ceasar again texted her probation Officer, this time falsely claiming, "My friend mom sent me money" and seeking permission to travel to a Western Union branch to collect funds actually sent by Person-1. Based on the investigation to date, including Ceasar's own description of Person-1 to others, Person-1 is neither a family member nor a family friend. Rather, he is a stranger she met online through the Athan application.

Later, on September 8, 2020, after twice lying to her probation officer about the source of the funds, Ceasar collected the money from Western Union. At no point during their exchanges on September 7 and 8 did Ceasar inform her probation officer about her installation of

_____

what it deems a perfect Islamic society." Vidino Rpt. at 23. In 2016, Ceasar repeatedly used the term in this extremist manner as part of her support for ISIS and admitted to doing so in her plea allocution to the Material Support Offense. See Feb. 2017 Plea Tr. at 26-27.

Signal, her encrypted contacts with Person-1, that Person-1 was a stranger to her, or that Person-1 was the one who had just wired her approximately $500.

That evening, Ceasar viewed a post on Athan by Person-1 stating, "Christians is our enemy[]" in response to another user's post. Ceasar then replied to Person-1's message stating "watch what you say." Within minutes, Ceasar received a Signal message from Person-1 asking, "Is anything wrong when I'm saying Christians is our enemy". Ceasar replied with the following series of Signal messages to Person-1:

> "Please don't say that in my phone";
> "They are people of the book";
> "We are all same we sin";
> "We are bad in different ways"; and
> "Allah is the judge of that"

Screenshots of Ceasar's cellular phone show that immediately after sending the above-listed Signal messages to Person-1, Ceasar changed the settings within the Signal application so that all incoming and outgoing messages within her conversation thread with Person-1 would automatically be deleted from the application within five seconds of being viewed.[14] Then, at approximately 9:30 p.m. on September 8, 2020, Ceasar appears to have started the process of uninstalling the Signal application from her phone.

The next morning, September 9, 2020, Ceasar emailed Person-1. That same night, at approximately 11:38 p.m., Ceasar re-installed the Signal application on her cellular phone. Ceasar then used Signal to call Person-1 over the encrypted platform; the call was not answered. Ceasar then used Signal to send several text messages to Person-1, writing "Hello"

---

[14]    As indicated in the screenshot from Ceasar's cellular phone, Signal provides users the option to set automatic deletion for five or ten seconds after a message is viewed, as well as an option for no automatic deletion.

and "R u there," to which Person-1 responded "yes." The two then exchanged messages in which Ceasar told Person-1 she was going to delete the Signal application from her phone because of data limits, after which Person-1 informed Ceasar that he uses only Signal because it is encrypted. Ceasar told Person-1 she would keep in touch via email and that her "Auntie" thanked him. Records, as well as the search of Ceasar's phone pursuant to the search warrant indicate that Ceasar again uninstalled the Signal application from her phone.

Notably, records show that on September 8, 9, and 10, 2020, Ceasar exchanged texts with her probation officer about her upcoming schedule and her health; at no time during any of these interactions, nor at any other point, did Ceasar inform her probation officer about her use and ultimate deletion of Signal from her cellular phone.

Additionally, phone records show that Ceasar communicated with her mentor Daisy Khan multiple times shortly before, during and after the period when Ceasar was communicating with Person-1, including communications exchanged with Ms. Khan each day from September 1 through September 10. Ceasar's engagement with Daisy Khan during the same time period did not dissuade her from any of her unauthorized communications with Person-1.

Probation has informed the government that, at some point after Ceasar's receipt of $500 sent by Person-1 in September 2020, Probation learned that Ceasar was soliciting money from strangers online. When Probation discussed the matter with Ceasar, Ceasar explained that she was seeking money from members of the Muslim community and that giving money to those less fortunate is a normal thing to do within the faith. Ceasar's probation officer cautioned her that she should not take money from strangers she met online, and that she should only take money from people she knew. Ceasar's probation officer also instructed Ceasar that she should

34

provide him with the identity of anyone who provided her with money in the future, along with the sender's basic background information.  Probation explained that this instruction was for Ceasar's protection, so that she did not inadvertently take money from someone from whom she should not receive money.  Ceasar stated that she understood the direction and agreed to follow it.

Ceasar then continued her attempts to communicate with Person-1 over an encrypted platform that she never disclosed to Probation.  On September 27, 2020, Ceasar downloaded and installed the Viber encrypted messaging and voice call application at approximately 9:12 p.m.  The application then auto-populated all contacts previously saved in Ceasar's cellular phone, including Person-1's contact.  A few minutes after downloading Viber, Ceasar used the application to call Person-1. The call was not answered.

On the morning of September 28, 2020, Ceasar exchanged text messages with her probation officer in which she informed him that she had deleted the Zynn social media account from her cellular phone because of technical difficulties with the application, and stated "so you can delete that out of the file please."  She then added that she would register an Instagram account instead of the Zynn account.  Ceasar then created an Instagram account.  At no point in this text exchange did Ceasar inform her probation officer that the night before, just hours before she deleted her Zynn application, she had installed Viber as described above.  By contrast, Ceasar downloaded and registered an Instagram account on September 28, 2020, which she promptly disclosed to Probation as required.  Again, Ceasar chose to disclose certain applications to Probation while hiding others.  Records indicate that on September 30, 2020, Ceasar deleted or uninstalled the Viber application from her cellular phone.

Records show that on October 5, 2020, Person-1, under his "Mumin" profile with the ISIS flag image, posted a statement on Athan condemning as "Kafir" an individual who wrote a message criticizing ISIS.[15]

In October 2020, records show that despite Probation's explicit directive to the contrary, Ceasar again sought to obtain money from Person-1, this time going further to conceal her actions from Probation. Specifically, on October 7, 2020, Ceasar began texting an associate ("Person-2") seeking to use Person-2 as a conduit to obtain more money from Person-1 without Probation's knowledge. Ceasar told Person-2, "I'm trying to get money from this old muslim guy who helps me with bills and food but my probation officer said that I should know what Job he works and how he gets money general." Ceasar continued, "Like I have to tell them everything," and "I said I get help from my friends time to time" and, in apparent reference to her probation officer, "He said that prosecutor like to fish for things and flip it in court to make things worse." In a statement to the government, Ceasar's probation officer denied the latter statement to Ceasar but confirmed, as detailed above, that he had instructed Ceasar not to accept money from strangers and to inform Probation about plans to accept donations from people she met online.

Ceasar also told Person-2 that she wanted the money from Person-1 for a job-related class and certification, and that "I have to tell my lawyers and probation officer everything about how my friend is getting money." Ceasar then described Person-1 as "from Australia" and "[h]e converts." Ceasar further described Person-1 as "a random from afar" and

---

[15]    The screenshots of Ceasar's phone obtained from Probation's phone monitoring software do not indicate whether Ceasar saw this specific post by Person-1. Rather, the FBI viewed the post as part of its investigation.

explained that she needed Person-2's assistance in obtaining money from Person-1 without Probation's knowledge "because my probation and lawyers only trust my friends."  Person-2 wrote to Ceasar, "Y dont u type the email and fix it up and I'll send it dummy" and "ur lawyers and officers dont need to know about this" and "all they need to know is that I sent u they money."  Ceasar responded "Ok" and then wrote the equivalent of "hahahaha" in Arabic.  Ceasar then sent Person-2 a message Ceasar drafted for Person-2 to send to Person-1 requesting additional money for Ceasar.  To date, it is not known whether Person-2 succeeded in obtaining additional funds from Person-1 on Ceasar's behalf.

Records further show that on October 7, 2020, while still exchanging texts with Person-2 about obtaining money from Person-1, Ceasar engaged in a WhatsApp voice call with Daisy Khan, her mentor who testified at Ceasar's sentencing that she "would create a life plan for [Ceasar] as to what she needs to do with her life to reset her life in a different direction."  Sent. Tr. 185.  At approximately 3:35 p.m., while Ceasar and Khan were still talking, Person-2 texted Ceasar, in reference to Person-1, "What does he know u by?" and "And do I need to tell him how much we need?"  Then, while still talking with Khan, Ceasar wrote to Person-2, "1000" / "Amera Ceasar" / "From NYC" / "From Muslim Prayer app" / "Put it".  In other words, while engaging in a scheme to avoid Probation's detection of her receiving money from an online stranger with extremist views and an ISIS flag as his profile photo, Ceasar was simultaneously talking to the individual defense counsel had identified as critical to Ceasar's successful rehabilitation.  Phone records show that Ceasar also was in contact with her probation officer and her defense counsel around the time she was soliciting Person-2's help in deceiving Probation.  None of these contacts deterred Ceasar from plotting to deceive Probation.

iv.   The Defendant's Destruction of Evidence of Her Violations
      of Her Conditions of Supervised Release

Prior to the FBI's October 16, 2020 seizure of her cellular phone, Ceasar deleted

records to conceal her unlawful conduct, just as she did while on presentence release in 2018.

The defendant's destruction of evidence demonstrates both that the defendant knew her conduct

was prohibited and her intent to deceive the Probation Department and the Court about her

compliance with the conditions of her supervised release.

For example, Ceasar deleted her August 16, 2020 text messages with Facebook

User 2.  Specifically, records from Ceasar's cellular phone indicate that at approximately 7:27

a.m. on August 18, Ceasar scrolled through her text messages with Facebook User 2, during

which her text exchanges with another associate are also visible.  Approximately one minute

later, Ceasar again scrolled through her text messages but this time her texts with Facebook User

2 were no longer visible, indicating that she had deleted them.  Later that same morning, Ceasar

met with her probation officer for a previously scheduled office visit, suggesting that Ceasar

deliberately deleted her text messages with Facebook User 2 so that her probation officer would

not see them.  An analysis of Ceasar's cellular phone following its seizure by the FBI confirmed

that Ceasar deleted all of her text messages with Facebook User 2.  Screenshots of Ceasar's

cellular phone show that Ceasar also deleted Facebook User 2's contact information from her

cellular phone at some point between August 20 and 22, 2020.

Ceasar also deleted or uninstalled her encrypted Signal and Viber accounts, both

of which she used to contact Person-1 and neither of which she disclosed to Probation.

Additionally, as detailed above, prior to uninstalling Signal from her phone, Ceasar, immediately

after a series of exchanges with Person-1, changed the settings within the Signal application to

automatically delete messages in her conversation thread with Person-1 five seconds after each

message was viewed.  Ceasar also deleted or uninstalled the Athan application from her cellular phone after using the application numerous times, including to contact Person-1.

> v.    The Defendant's Continued Use of Extremist Language

After her release from prison in July 2020, Ceasar again reverted to using some of the same extremist terminology for non-Muslims that she used when committing her Material Support Offense. This conduct demonstrated that the defendant retains an extremist mindset.

For example, as noted above, after registering her Athan account in August 2020, Ceasar wrote a post in which she referred to non-Muslims as kuffar.  On August 24, 2020, Ceasar texted an associate about clothing and stated, "She can have it because I don't wear there kuffar clothes."  On September 1, 2020, in text to another associate, Ceasar wrote "I said they want me to look like a kafir immodest clothes."  On September 6, 2020, in response to a user's question on the Athan application about the permissibility of eating Kentucky Fried Chicken, Ceasar wrote "it's not halaal, it processed and killed by kafir," using an alternative spelling for "kuffar."  On September 20, 2020, while texting an associate, Ceasar stated that Algeria was part of Morocco "until kuffar and devil split the muslims up to settle in our land."

Ceasar's persistent, almost casual use of such language is disturbing.  She used the same kind of extremist language for non-believers during the commission of her Material Support Offense and while violating her bail conditions in 2018, further undermining her claim to Judge Weinstein that she had changed.  Moreover, Ceasar's use of such language on social media sites – including on sites she failed to identify to Probation as directed – shows that she had not reformed.

vi.   The Defendant's Unapproved and Unreported Contacts
with Convicted Felons

Charge Three of the VOSR Report to which Ceasar pleaded guilty charged her

with contacting two previously convicted felons, Ila Little Howard and Demetrius Morris.  See

VOSR Report at 9, 12.  Morris is a relative of Ceasar's currently serving a life sentence for

murder.  Id. at 12.  Ceasar and Howard served time together at FCI Tallahassee, where Howard

was serving a sentenced of 210 months' incarceration for drug trafficking and money laundering

offenses.  In addition to the information provided in the VOSR Report regarding Ceasar's

unapproved, unreported communications with Howard, records show that Howard identified

Ceasar's contact information to the BOP as belonging to "Rachel Woodrum" on Howard's

approved contact list, presumably so that Howard's and Ceasar's communications would evade

potential blocking by the BOP communication monitoring system.

The government's investigation has revealed that in addition to these unapproved

contacts, Ceasar also repeatedly contacted at least five other convicted felons between August

and October 16, 2020, when her internet-capable cellular phone was seized by the FBI.  Ceasar

engaged in these contacts without Probation's knowledge or permission and thus in violation of

her conditions of release.

Records show that Ceasar began contacting Devron Brown ("Brown"), her former

husband by Islamic marriage and a convicted felon, from her quarantine hotel landline phone

beginning in July 2020.  Phone records show that once she received her cellular phone on August

12, 2020, Ceasar engaged in numerous phone calls, texts, and WhatsApp exchanges with Brown.

Brown was previously convicted of, among other things, a felony drug trafficking offense.

Notably, on or about August 31, 2020, Ceasar used Brown's name, email address and credit card

to purchase access to the Gappsy application[16] and install it on her cellular phone. Ceasar did this while on a WhatsApp voice call with Brown. Ceasar disclosed none of these facts to Probation.

> ### vii.    The Defendant's Continued Creation and Use of Undisclosed Apps and Online Accounts

The government's investigation of the defendant's post-release misconduct revealed that even after the Probation Department made clear that it was aware of the defendant's violations of the conditions of her supervised release, and after the government obtained a search warrant which resulted in the seizure of her only Probation-approved electronic device, the defendant continued to violate her conditions of supervision.

The FBI's investigation, which continued even after the government filed the March 29 Letter, ultimately revealed evidence that after December 2020 the defendant registered accounts for and used at least 13 social media and encrypted mobile messaging applications. Those records showed that Ceasar downloaded and used these applications to communicate with known and unknown individuals on at least one cellular telephone and other Internet-enabled devices she had not been authorized to use. For example, Google records for Ceasar's ceasaramera@gmail.com account showed multiple logins and logouts from multiple devices not disclosed to the Probation Department in the time period November 2020 to June 2021. Google records also showed that between December 1, 2020, and March 9, 2021, Ceasar logged in or out of her ceasaramera@gmail.com account more than 50 times from an Android 9 OS cellular phone that the defendant did not disclose to the Probation Department. The activity included logins to her email from an IP Address that resolved to Hope House from the Android device late

---

[16]    Gappsy is a mobile application-building software tool.

at night or early in the morning. For example, on or about December 4, 2020, Ceasar logged into her Gmail account from the Hope House IP Address at approximately 4:00 a.m.

The FBI's review of Google records further revealed that Ceasar backed up a WhatsApp account to her Google Drive, indicating her use of the encrypted messaging platform after the November 2020 VOSR Report was issued. While the data files were encrypted, the images were sent unencrypted allowing them to be backed up to the Google Drive and were viewable by the FBI in the records provided by Google. Among the images, one clearly showed Ceasar using WhatsApp to communicate with an unidentified male on or about December 17, 2020 at 11:50 p.m.

Records obtained by the government further show that on January 5, 2021, the same day she pleaded guilty before this Court to Violation Charges One and Three, Ceasar registered a WordPress account online, which she did not disclose to Probation. WordPress is a web publishing site that allows users to create websites and blogs. WordPress also has a feature that allows users to send messages to each other. Other records obtained by the government show that on or about February 13, 2021 – more than a month after she pleaded guilty to using multiple applications without Probation's knowledge or approval – Ceasar registered a Pinterest account. Pinterest is an image sharing and social media service that enables users to, among other things, save and share information, including by allowing users to send direct messages to each other. Ceasar never disclosed to her probation officer her creation of her Pinterest account. Records obtained by the government further demonstrated that, as of the date the government filed the March 29 Letter, the defendant's most recent login to her undisclosed Pinterest account had occurred on or about March 9, 2021 using the Hope House WiFi network. As previously noted, Ceasar was not at that time approved by Probation to use any electronic device outside the

presence of her counsel.  Only later, at a status conference on March 30, 2021, did defense

counsel advise the Court that the defendant appeared to have created the WordPress and Pinterest

accounts while logged in to defense counsel's own laptop.  See Mar. 30, 2021 Tr. at 24-25.

3.     The Defendant's Conduct While Sentencing on the VOSR Was Held In Abeyance

i.     The Defendant's Failure to Cooperate with the DEEP Assessment

The Court held the defendant's sentencing on VOSR Charges One and Three in

abeyance so that the defendant could be assessed for participation in the Disruption and Early

Engagement Program or "DEEP."  Although the government objected to the defendant's

participation in DEEP, explaining that "diversion program designed to disrupt individuals who

are mobilizing toward violence before they commit violent crimes is not a suitable program for

the defendant, a recidivist felon with a demonstrated refusal to comply with even the most basic

Court-imposed conditions of release," see Gov't Motion, Dkt. No. 17-CR-48, ECF No. 136, at 4

(Mar. 25, 2021), the Court overruled the objection.  When the Court asked the defendant whether

she would "participate in that assessment in good faith with honesty and candor," the defendant

replied that she would.  Mar. 30, 2021 Tr. at 45.  The Court ordered the parties to appear for

monthly status conferences to monitor the defendant's progress as the DEEP assessment

proceeded.

The defendant, however, continued her pattern of violating the conditions of her

release and deceiving and manipulating those around her.  In a status report submitted by the

Probation Department on June 8, 2021, the Probation Department reported that the DEEP

program had suspended the defendant's participation in the DEEP assessment because the

defendant had missed DEEP therapy sessions with Dr. Schouten.  Instead, the DEEP program

determined that the most effective way to proceed was to suspend therapy until the defendant entered into a "therapeutic contract" with the DEEP psychologist.

As detailed in the Probation Department's June 28, 2021 status report, representatives of DEEP agreed that the defendant should not participate in DEEP treatment until the defendant could receive a neuropsychological assessment sought by defendant's counsel. Defense counsel did not ultimately procure a neuropsychological assessment for the defendant before she fled and was re-arrested. Accordingly, the defendant never participated in good faith in the assessment by the DEEP program, and never participated in the services that the DEEP program offered.

ii.    The Defendant's Eviction from Hope House

In early May 2021, the Probation Department learned that the defendant was being evicted from her residence at Hope House because the defendant had committed multiple violations of Hope House policy. As documented in a status report submitted by Probation to the Court on May 24, 2021, a Hope House manager reported to Probation that other residents and staff were in fear for their safety as Ceasar allegedly threatened residents in an effort to utilize their smartphones to conceal her online activity from the Probation Department and the FBI. The Hope House manager also detailed complaints of Ceasar playing loud Arabic music, and when residents confronted Ceasar, residents claimed that Ceasar said "we play this music prior to blowing people up." The manager further stated that the situation had reached the point where the Hope House employee who works at the residence was reassigned due to threatening messages she received from an unknown number. The text messages were forwarded to the defendant's probation officer and they depicted several threatening messages to the Hope House employee as well as a picture of a female wearing a headdress pointing a firearm. When Probation confronted the defendant about the messages, Ceasar denied sending them, but

exhibited knowledge of the content of the messages when she specifically referred to details in the messages to explain why they demonstrated she had not been the one to send them.  The defendant claimed that her attorneys had obtained copies of the messages and had shown them to her.

In interviews with the FBI, the Hope House program manager explained that the decision to discharge the defendant had been taken on April 10, 2021, after the defendant had been involved in an altercation with other residents. According to the Hope House program manager, the altercation capped a lengthy series of problems with the defendant, characterized by the defendant's lying and manipulative behavior and non-compliance with Hope House rules.[17]  The Hope House program manager further reported to the FBI that, in addition to other violations of Hope House policy committed by Ceasar during her stay there, another resident of the facility alleged to Hope House staff that Ceasar possessed a second cellular phone while residing at Hope House.

The FBI interviewed a resident of Hope House who had gotten to know Ceasar and became afraid of her during Ceasar's time there (the "Resident").  The Resident, who is Muslim, described the defendant as manipulative and terroristic, stated that the defendant made the Resident afraid to be a Muslim, and that she was happy after the defendant left Hope House. The Resident reported that she believed the defendant had access to a laptop and access to a

_____

[17]    According to the Hope House program manager, after a discharge letter was provided to the defendant on April 14, 2021, the Federal Defenders actively discouraged Hope House from informing the defendant's probation officer.  The Hope House program manager advised the FBI that the defense did not want the prosecutors to find out about the timeline of the defendant's discharge because it would impact the ability for the defendant to be supervised, and stated that the Federal Defenders claimed that the defendant was not at fault for her behavior because she had a history of trauma, a defense that Ceasar also asserts in connection with her resentencing.

smart phone, possibly an iPhone.  According to the Resident she received photos from the defendant via text message that appeared too clear to have been taken by the defendant's flip phone, and the Resident observed a new iPhone 6 box in the defendant's possession.  The Resident additionally reported that she believed that the defendant had used the Resident's laptop computer in late April 2021.  As would become particularly relevant later, when Ceasar tried to flee to Russia after the Second Circuit remanded her initial sentence, the Resident reported during her June 29, 2021 interview by the FBI that the defendant told the Resident that she was previously arrested for "marching" for ISIS with her "husband."  The Resident advised that the defendant's "husband" was also involved with "marching" for ISIS and is from Russia or somehow involved with Russia. The Resident advised that she understood that the husband owns two businesses, including a construction and a real estate business.  The Resident further described the defendant as infatuated with Russia and reported to the FBI on June 29, 2021, that Russia was the defendant's current goal.

### iii.   The Defendant's Continued Violations of the Conditions of Her Supervised Release at the Wolcott Hotel

Following her eviction from Hope House, on or about May 7, 2021, Ceasar moved, with the Probation Department's knowledge, to the Wolcott Hotel through a program run by Exodus Transitional Community, Inc., which leases blocks of rooms as temporary housing for recently released inmates.  The FBI's investigation has revealed that at the Wolcott Hotel, Ceasar continued her pattern of unmonitored access of Internet-capable electronic devices.

Records obtained from Google have revealed that throughout June and July 2021, Ceasar logged into her ceasaramera@gmail.com email account more than 20 times from an IP Address which resolves to the Wolcott Hotel, or which is associated with Exodus Transitional Community.  The Probation Department confirmed to the FBI, via its GPS monitoring of Ceasar,

that Ceasar was physically present at the Wolcott Hotel when many of these logins occurred, further indicating her unauthorized use of an internet-enabled device. On or about July 22, 2021, the FBI interviewed employees of the Wolcott Hotel regarding their WiFi. During the interview, they were shown a photograph of Ceasar. One employee, who was responsible for providing the WiFi passwords to Wolcott Hotel guests, instantly recognized Ceasar by her room number and advised that the defendant asked for the WiFi password every time the password changes. The employee then looked up the room number and confirmed the resident asking for the WiFi password was Ceasar.

On or about July 29, 2021, an employee at the Wolcott Hotel voluntarily provided the FBI with video footage of the lobby at requested date-time intervals. The video footage reflects Ceasar using Internet-enabled devices, accessing the Internet, and, at minimum, logging into her Gmail account, without the permission of the Probation Department and without being monitored by defense counsel. Specifically, the FBI reviewed the lobby surveillance video footage during times in which records obtained from Google reflected that Ceasar had accessed her Gmail account. The FBI observed a person that appeared to be Ceasar using different electronic devices in the lobby of the Wolcott Hotel on multiple occasions.

Beyond Ceasar's continued unauthorized use of unmonitored Internet-enabled electronic devices and her undisclosed creation of social media and mobile messaging accounts, Ceasar continued to communicate with individuals she knew to be convicted felons in violation of the conditions of her supervised release. For example, between approximately March 10, 2021, and May 9, 2021, Ceasar received over 60 telephone calls from Munir Shakir, who was incarcerated at the Northern State Prison in Newark, New Jersey where he was serving a 16-year sentence related to robbery charges. Ceasar engaged in at least three and a half hours of

47

telephone calls with Shakir.  On or about June 8, 2021, Ceasar engaged in a 15-minute telephone

call with Demetrius Morris, who is currently serving a sentence for murder.  Records show that

Morris identified Ceasar's contact information to the BOP as belonging to "Amira Morris" on

Morris's approved contact list.  Notably, Morris was one of the felons with whom Ceasar

communicated that resulted in the Probation Department's initial November 2, 2020 VOSR

Report.  As another example, between November 2020 and July 2021, Ceasar and Jalal Gould,

who was previously convicted of heroin distribution and credit card fraud, exchanged hundreds

of calls and text messages and also exchanged calls and text messages via the encrypted mobile

messaging application, TextNow. On or about July 3, 2021, Ceasar and Gould engaged in a

telephone call lasting almost three hours in duration. In the government's March 29 Letter, the

government had identified Gould as a convicted felon with whom Ceasar had exchanged

numerous calls and texts as well as WhatsApp, TikTok, and Instagram messages between August

2020 and November 2020.

> F.  The Defendant's Flight From Prosecution Resulting in Her Conviction for the
> Failure to Appear Offense (No. 22-CR-459)

>> 1.  The Court of Appeals' Decision, the Government's Motion for Detention
>> and VOSR Charges Four through Eight

On August 18, 2021, the U.S. Court of Appeals for the Second Circuit issued an

opinion that decided the government's sentencing appeal by vacating the defendant's 48-month

sentence as "shockingly low" and remanding to this Court to resentence Ceasar consistent with

18 U.S.C. § 3553(a) and the opinion of the Court of Appeals.  See United States v. Ceasar, 10

F.4th 66, 80 (2d Cir. 2021).  When the opinion was issued, the defendant was scheduled to

appear before the Court for a videoconference on August 25, 2021.  See Minute Entry, Dkt No.

17-CR-48 (July 29, 2021).  On August 19, 2021, the Court issued an Order on the docket of

Ceasar's cases stating "ORDER: A status conference in this action has been scheduled for

8/25/2021 at 9am. Non case participants may access the conference on 8/25/2021, by dialing 1-650-479-3207 and entering access code: 180 664 1682. Ordered by Judge Kiyo A. Matsumoto on 8/19/2021." <u>See</u> Minute Order, Dkt. No. 17-CR-48 (Aug. 19, 2021).

On August 23, 2021, the government filed a motion on the dockets of Ceasar's cases assigned to the Court in which the government asked the Court "to immediately order that the defendant be held in custody pending further proceedings in the Court of Appeals and in this Court." Gov't Mot. at 1, Dkt. No. 17-CR-48, ECF No. 156 (Aug. 23, 2021). Among other things, the government disclosed, for the first time, evidence that Ceasar had continued to violate her conditions of supervised release by accessing Internet-enabled electronic devices at the Wolcott Hotel, creating and accessing social media and electronic messaging accounts, and communicating with convicted felons. <u>See</u> <u>id.</u> at 5-6.

On the morning of August 24, 2021, the Probation Department filed a Supplemental VOSR Report charging Ceasar with five new violations of the conditions of her supervised release, numbered violation charges Four through Eight: (4) between December 2020, and March 2021, Ceasar downloaded and accessed unreported applications and accounts, including social media accounts, to a cellular telephone and other internet-capable devices without the knowledge of the Probation Department; (5) between December 2020 and March 2021, Ceasar failed to provide account identifiers and passwords for accounts and applications downloaded and accessed via a cellular telephone and other Internet-capable devices without the knowledge of the Probation Department; (6) between December 2020 and March 2021, Ceasar failed to identify computer systems and Internet-capable devices she accessed to the Probation Department for monitoring purposes; (7) between November 2020 and July 2021, Ceasar corresponded with individuals known to have felony convictions; and (8) between December

49

2020 and June 2021, Ceasar failed to notify the Probation Department of financial accounts as

required.  In its Supplemental VOSR, the Probation Department advised the Court that Ceasar "is

returning once again to similar conduct as the instant offense," that "the Probation Department

believes Ceasar's continued actions represent a risk to the public given Ceasar's history of

having contact with known ISIS supporters" and further "that Ceasar is an increased flight risk as

she is now facing a significant period of custody in connection with her resentencing on the

instant offense."  Supp. VOSR Report at 21.  "Consequently, the Probation Department

recommend[ed] that Ceasar be remanded immediately."  Supp. VOSR Report at 22.

On August 24, 2021, the Court once again issued an Order on the docket of

Ceasar's cases stating "ORDER: All parties shall appear for a status conference by

videoconference on August 25, 2021, at 9:00 am. Non case participants may access the

conference on August 25, 2021 by dialing 1-650-479-3207 and entering access code: 180 664

1682. Ordered by Judge Kiyo A. Matsumoto on 8/24/2021."  See Minute Order, Dkt. No. 17-

CR-48 (KAM) (E.D.N.Y. Aug. 24, 2021)).

2.    The Defendant's Flight

Early in the morning before the status conference, Probation was alerted that the

defendant's ankle bracelet location monitoring device had begun emitting signals indicating that

it had been tampered with or removed.  Later that morning, in violation of the Court's orders and

the conditions of her supervised release, Ceasar did not appear at the video status conference

scheduled for August 25, 2021, at 9:00 a.m.  Shortly after the status conference, the Court issued

a warrant for Ceasar's arrest for failure to appear, and for Ceasar's unauthorized removal of her

location monitoring ankle bracelet in violation of the conditions of Ceasar's supervised release.

The FBI's investigation of Ceasar's failure to appear at the status conference has revealed that

she deliberately fled, intending to leave the country, in violation of her conditions of supervised

release.  Through the investigation the FBI learned that Ceasar had enlisted the help of at least

two co-conspirators, a prior convicted felon also living in transitional housing at the Wolcott

Hotel she had become acquainted with (hereinafter "CC-1"), who had in turn introduced Ceasar

to another prior convicted felon that CC-1 had become friends with in New York State custody

but was living in New Mexico (hereinafter "CC-2").  Over the course of the next few days, the

FBI obtained numerous business records, interviewed witnesses, and executed search warrants

across the United States, obtaining a comprehensive account of Ceasar's efforts to flee New

York and the United States before she was captured at an automotive repair shop in Socorro,

New Mexico.

        The FBI interviewed a witness who is friends with Ceasar (the "Friend"), and who

advised the FBI that on the evening of August 24, 2021, at approximately 7:59 p.m., Ceasar sent

the Friend the following text messages from the phone number associated with the flip phone

that Ceasar was authorized to use:

> Ceasar: Listen to voicemail. my legal team said its 1000 prison tomorrow.
>
> Ceasar: They tired of fighting for me? they did invstigate  hope house wifi adn my uncle munir and jalaal and paulino, etc also exodus and old jobs about me. which they should remain silient so now im n deep trouble with allegations!
>
> Ceasar: 9am court

When Ceasar wrote "my legal team said its 1000 prison tomorrow," and "9am court," Ceasar

was indicating her knowledge that she was required to appear in Court at 9:00 a.m. on August

25, 2021, and that she believed that the Court was certain (1000, i.e., 1000%) to order that

Ceasar be detained in custody at the status conference.  Further, when Ceasar stated "they did

invstigate  hope house wifi adn my uncle munir and jalaal and paulino, etc also exodus and old

jobs about me," and stated "so now im n deep trouble with allegations," Ceasar referred to

information she learned about the FBI's investigation of her conduct on supervised release, including her use of Internet-enabled electronic devices ("hope house wifi"), communications with convicted felons ("my uncle munir and jalaal and paulino, etc") and the allegations about that conduct detailed in the Probation Department's Supplemental VOSR Report, and in the government's motion for detention.

Telephone records reveal that the defendant engaged in a flurry of communications with first CC-1 and then later CC-2 beginning at approximately the same time that Ceasar sent text messages to her Friend about Ceasar's belief that she would be sent back to prison. The pattern of call and SMS text message activity between Ceasar, CC-1, and CC-2, indicates that Ceasar likely informed CC-1 of her belief that she would be sent to prison the next morning, and CC-1 subsequently placed Ceasar in contact with CC-2. Specifically, telephone records reflect that between approximately 7:54 p.m. on August 24, 2021, and approximately 2:42 a.m. early in the morning of August 25, 2021, there were approximately 54 SMS text messages sent between Ceasar's Probation-approved flip phone and CC-1's phone number. Telephone records further reflect that between approximately 10:03 p.m. on the night of August 24, 2021, and approximately 6:52 a.m. on the morning of August 25, 2021, there were 47 phone calls between Ceasar's Probation-approved flip phone and CC-1's phone Number. Before Ceasar's flight from prosecution, telephone records reflect that Ceasar and CC-1 had been in telephonic contact since at least as early as July 30, 2021.

Telephone records further reflect that between approximately 12:54 a.m. in the early morning of August 25, 2021, and approximately 6:49 a.m. the same morning, there were 10 phone calls between Ceasar's Probation-approved flip phone and the two numbers associated with CC-2 and his automotive shop in New Mexico. Telephone records further reflect that

between approximately 1:30 a.m. and 5:39 a.m. on August 25, 2021, there were approximately 13 SMS text messages sent between Ceasar's Probation-approved flip phone and phone numbers associated with CC-2.  Based on these telephone records, it appears that Ceasar's first telephonic contact from her phone with CC-2 was at 12:54 a.m. in the early morning of August 25, 2021.

The FBI subsequently obtained from CC-2's phone records of attempted and completed Facebook messenger audio calls and Facebook messenger text messages between one of CC-2's Facebook accounts and a Facebook account belonging to CC-1, beginning on or about August 24, 2021, at approximately 11:00 p.m. Eastern Time, the night before Ceasar's flight from prosecution. Those communications demonstrate that CC-1 and CC-2 agreed to help the defendant flee and used their own money to pay for the bus ticket that would bring her to CC-2 in New Mexico.

In one message sent by CC-1 to CC-2 at approximately 11:49 p.m. on August 24, 2021, CC-1 asked: "What is the address if u can help her out... Yes or no I do not want to bother u or it wife with this just a hand for her too get out."  CC-2 replied at approximately 12:19 a.m. on August 25, 2021, "Sorry phone died," and then provided the address of his automotive repair business in Socorro, New Mexico.  CC-1 responded "Do not worry inma checking the bus line to get there for her...." followed by "I gave u phone to her so u can get aquinted with her and tell her about it sis... Ok.. she is a good person..."  Later, at approximately 2:00 a.m., CC-1 wrote to CC-2, "Put it under my name," providing an alias that CC-1 has been known to use, and provided his email address, and stated "I will pick it up and give to jer."  At approximately 2:04 a.m., CC-2 wrote to CC-1, "Lol no worries. Told her I can help. The only thing I can do though is buy ticket with credit card. So you have to give me your card info and I will hit it for the $100 and then put rest on my card."  Corroborating these communications, Greyhound Bus records

reflect that a ticket from Penn Station, going through Albuquerque, New Mexico to Phoenix, Arizona was purchased and issued to a passenger using CC-2's name.

The Probation Department's Location Monitoring Unit scheduled Ceasar to depart from the Wolcott Hotel at 7:30 a.m. to go to her attorneys' office in Brooklyn, New York, to attend the August 25, 2021 video status conference in her attorneys' presence. In violation of her conditions of supervised release, Ceasar left the Wolcott Hotel at approximately 6:50 a.m., forty minutes early. Staff at the Wolcott Hotel interviewed by the FBI stated that Ceasar asked for but did not receive one of the free metrocards typically available to residents of the Wolcott Hotel before she left. Staff further advised the FBI that Ceasar had been acting strangely over the last day.

Records and ATM terminal surveillance camera video provided by TD Bank reflect that on or about August 25, 2021, at 6:56 a.m., approximately five minutes after she left the Wolcott Hotel, Ceasar attempted and failed to withdraw $360 before successfully withdrawing $300 from a TD Bank ATM located at 885 Sixth Avenue, in Manhattan, New York. Street surveillance video obtained by the FBI then showed the defendant leave the bank and walk eastbound on 32nd Street in the direction of the Pennsylvania Station transit hub. Other surveillance cameras showed Ceasar walking with a male the FBI later identified as CC-1. At approximately 7:00 a.m., the Probation Department's Location Monitoring Unit received a signal from the GPS location monitoring device attached to Ceasar's ankle indicating that the location monitoring device had been tampered with or severed from Ceasar's person. At the time the Location Monitoring Unit received the alert, Ceasar's GPS device was emitting GPS location information from the vicinity of 34th Street and Seventh Avenue in New York, the location of the Pennsylvania Station transit hub.

In interviews with the government following the defendant's arrest, CC-1 admitted to helping the defendant escape, introducing her to CC-2 and escorting her to the bus station. CC-1 advised that the defendant told him she "had to leave" because she was due in court the next day and was facing 20 years in federal jail if she didn't leave. CC-1 advised that he understood the defendant was not allowed to use computers and believed that staff at the Wolcott Hotel had told the FBI that she had been using computers. CC-1 stated that the defendant needed his help to pick up the bus ticket because CC-2 had purchased the ticket for the defendant under a male name, so CC-1 and another man left the hotel and walked with the defendant to the bus station. [18] CC-1 stated that he did not know that the defendant was wearing an ankle bracelet until he saw the defendant bend down toward her ankle and cut the bracelet with scissors. According to CC-1, the defendant tried to put the ankle monitor in the sewer, but it did not fit, so she gave it to the second man who later threw it out. CC-1 stated that he also saw the defendant break her flip phone in two and discard it. After CC-1 picked up the paper bus ticket and gave it to the defendant, the defendant gave CC-1 her camera and the keys to her motorized scooter before boarding the bus.

At approximately, 9:24 a.m. on August 25, 2021, CC-1 wrote to CC-2, "She is on her way," "Call me when u can.... When U have a time,." Review of other communications on CC-2's Android phone reflect that on or about August 26, 2021, at approximately 1:09 a.m. Eastern Time, CC-2 received an SMS text message from CC-1's phone number with the message

---

[18]    CC-1 was interviewed twice in September 2021, the second time in the presence of his attorney pursuant to a proffer agreement. During his second interview, CC-1 admitted that in his first interview, two weeks prior, he had initially lied to the interviewing agents about not knowing how the defendant had obtained the Greyhound bus ticket because he was scared. During the first interview CC-1 eventually admitted that he had in fact helped the defendant purchase the bus ticket and had picked it up.

"Call back what happen." Approximately two hours later, at 3:25 a.m. Eastern Time, CC-2

appears to have attempted to send an SMS text message to Ceasar's Probation-approved flip

phone with the text, "Where you at? Hope all went well."

Beginning at approximately 11:36 a.m. Eastern Time on August 26, 2021, CC-2

exchanged a series of SMS text messages with a New Mexico phone number that CC-2 saved to

his contacts as "Hija." The first messages, sent by "Hija," stated "Hey I got a iPad" "John,"

using CC-2's first name. CC-2 replied minutes later, stating "Yes. Text now is cool for texting

sucks for phone calls" and "Keep me posted as you come to the stops. Text me at every stop."

Based on the context, including CC-2's references to Hija's "stops," I believe that CC-2

understood that "Hija" was Ceasar, and that she was using the TextNow messaging application

to communicate with CC-2 from an iPad that she had purchased while she was traveling to New

Mexico on a Greyhound Bus. Notably, Ceasar was found in possession of an iPad when she was

arrested at CC-2's business on August 27, 2021, and review of the iPad pursuant to a search

warrant revealed copies of the same messages between "Hija" and CC-2 found on CC-2's

Android phone.

Ceasar continued the discussion, responding to CC-2, "I'm using signal app

because fbi doesn't have access to this app," and "It's fully encrypted app u should try it." Later,

at approximately 12:26 p.m. Eastern Time, Ceasar stated "I'm at Missouri" followed by "I saw

the bench warrant out on google for me it's saying that judges thinks that I cut my gps off or

something else." Ceasar's second message was an apparent reference to a Reuters article

published on the Internet at approximately 10:40 a.m. Eastern Time on August 25, 2021, that

reported on the public status conference for which Ceasar had failed to appear as ordered at 9:00

a.m. that day.[19]  The article reported that the government had advised the Court of its concern that signals from Ceasar's GPS location monitoring ankle bracelet indicated it had been tampered with or cut off, and the article further reported this Court's announcement that it would grant the government's request and issue a bench warrant for Ceasar's arrest.  CC-2 responded to this text message at approximately 1:17 p.m. Eastern Time, asking, "You can Google warrants?" Ceasar replied at approximately 7:09 p.m. Eastern Time, writing, "What" "I type myself in google" "Its a bench warrant" "Wifi sucks."

The FBI's review of the contents of the iPad has revealed significant evidence that Ceasar intended to flee to a country that would not extradite her to the United States, namely Russia, and that Ceasar's flight from prosecution and her efforts to escape to Russia were motivated, at least in part, by her desire to eventually travel to Afghanistan to continue her support ISIS.  Shortly after acquiring the iPad on August 26, 2021, the defendant used it to perform Google searches for "sinmyah amera ceasar warrant," "Albuquerque station bus," and the name of one of her attorneys in New York.  At approximately 8:20 a.m. Eastern Time on August 27, 2021, Ceasar searched for "islamic state use social media platforms" followed by additional searches for "sinmyah amera ceasar warrant," "fbi warrant search," and "countries that don't extradite to the us."  Ceasar's web history reveals that Ceasar read multiple news articles published about her flight from prosecution, and she took screenshots of some of the webpages that she visited, including the Reuters article reporting on the Court's decision to issue a bench warrant for her arrest, and of a webpage with the heading "The Best Non-Extradition Countries

---

[19]     See Stempel, Jonathan, "Woman who aided Islamic State skips hearing, US fears she cut GPS bracelet," Reuters (Aug. 25, 2021), https://www.reuters.com/legal/litigation/woman-who-aided-islamic-state-skips-hearing-us-fears-she-cut-gps-bracelet-2021-08-25/.

For Your Escape Plan," of which Russia was listed first.  Ceasar also took a screenshot of a news article reporting that ISIS supporters had learned to hijack social media accounts to spread extremist content and had evaded social media prohibitions on extremist content by blurring ISIS logos and using strange punctuation and symbols to obscure words associated with support for ISIS, thus defeating automated monitoring systems.

Ceasar also downloaded the TextNow, Signal and Telegram encrypted messaging applications, among other applications, and created a new Facebook account, which she registered using a newly created email address under the vanity name "Royal Rain."  Ceasar also created a Google email address that Ceasar used to register her Royal Rain Facebook Account, "royaltattoos94@gmail.com."

While Ceasar was attempting to flee the country, on August 26, 2021, the ISIS Khorasan Province ("ISIS-K") publicly claimed responsibility for a suicide bombing terrorist attack at the Hamid Karzai International Airport in Kabul during the U.S. military evacuation from Afghanistan.  The ISIS-K terrorist attack at the Hamid Karzai International Airport in Kabul killed 13 members of the United States armed forces and approximately 169 Afghan civilians attempting to gain entry to the airport.  On August 27, 2021, shortly after the attack, Ceasar used the Telegram messaging application and Google's publicly accessible translation tool on the iPad and attempted to communicate in Farsi with one individual she believed might be located in Afghanistan.  Based on draft translations of her messages, Ceasar asked this person to help her get to Afghanistan or somewhere nearby.  After the individual appeared to rebuff her plea for help to travel to Afghanistan, Ceasar attempted to delete the conversation.  Notably, as part of her commission of Material Support Offense in 2016, Ceasar had used Telegram to stay

in regular contact with recruiters for ISIS-K located in Afghanistan,[20] and those ISIS-K members had assisted Ceasar to obtain a visa to travel to Afghanistan, which she did not ultimately use. Review of Ceasar's activity on Telegram indicates that she also contacted several other Telegram accounts.

At approximately 10:03 p.m. Eastern Time on August 26, 2021, Ceasar wrote to CC-2, "4am" "Get some sleep," apparently referring to the time that her bus was scheduled to stop in Albuquerque, New Mexico, i.e., 4:00 a.m. Mountain Time, which is 6:00 a.m. Eastern Time. CC-2 and the defendant then discussed renting a motel room so that the defendant could shower and the two of them could get some sleep before driving from Albuquerque to CC-2's sister's home where the defendant planned to stay. At approximately 12:35 a.m. Eastern Time on August 27, 2021, Ceasar told CC-2, "I had to use my atm to take out last of money so they wont track me after here." Notably, TD Bank records reflect that Ceasar withdrew approximately $40 from her account at an ATM machine at the Greyhound bus stop in Amarillo, Texas shortly before midnight on August 26, 2021. At approximately 1:23 a.m. Eastern Time, Ceasar stated, "I'm deactivating now my card." In response to Ceasar, at approximately 3:12 a.m. Eastern Time, CC-2 wrote in apparent alarm demonstrating that he knew the defendant was a fugitive, "You should of done that back on the east coast!!!!!!" CC-2 then wrote to Ceasar, "Check it out. Slight change of plans but still ALL good," "Call me. To much to text."

FBI Special Agents arrested Ceasar at CC-2's automotive repair shop in Socorro, New Mexico on August 27, 2021 at approximately 1:00 p.m. local time. In Ceasar's possession were the iPad that the FBI subsequently searched and a Greyhound bus ticket in CC-2's name.

---

[20]    ISIS-K is an affiliate of ISIS based in Afghanistan that characterizes itself as a province of the caliphate founded by ISIS's former leader, Abu Bakr al Baghdadi.

After Ceasar was detained in a county jail in New Mexico, Ceasar made several recorded phone calls in which Ceasar made numerous admissions.  Among others, Ceasar made the following statements:

- In response to the Friend questioning how the defendant made it to "Mexico" the Defendant responded: "Well, I can't talk on the phone about it 'cause that's called 'incrimination' they said, so… But I was about to go to Russia, but they caught me in time. I was like, 'Well, okay.' (chuckle) I was about to go to Russia." When the Friend laughed, the defendant responded: "No, seriously, that wasn't funny. That was my plan. I was like –"

- "Okay long story… I don't even care if this phone is recorded or not, I don't even care, the FBI already knows.  So you know, um, I was supposed to get resentenced, remember I told you they want me in prison.  So my lawyer was like, 'We're going to remand you anyway'. And I was like, 'I gotta go to prison?' So I was like, 'I'm not going to prison, I don't care, I'd rather die than go to prison,' so I was trying to flee the country.  I'm in Mexico. . . . Yeah, I'm in Mexico.  So like, you know, I had people help me or whatever, to leave or whatever, and the FBI was like, 'We don't understand how you can just like leave the country without us knowing'.  And I'm just like, it's common sense. You just know people.  It's like—"

- "I was going to court that day.  And I was like, well I'm not going to court.  I'm not going.  So I left.  And it took them today, right now, a couple hours ago, to arrest me.  Cause they didn't know where I was at.  I was really about to be overseas, but like they caught me right before I was about to go overseas."

- Referring to her flip phone and the ankle bracelet, the defendant denied destroying the phone and cutting off her ankle bracelet herself, but admitted that the phone was broken in half and that her bracelet had been cut: "The phone wasn't used—let me clear it up with you.  The phone I had when I said, 'are you out for [UI]" right, it was already broken right then and there. . . It was broken in half.  I didn't break it.  It was not me, I didn't break it.  So they lying about oh, they called you or you called him back and they said the ankle monitor-- . . . Anyway, but yeah.  I didn't cut it off and I didn't do, but anyway, yeah."

- Responding to the Friend's statement that "You just messed up your life.  You just messed it up," the defendant responded: "No, it was already messed up. Like it was already going to be 15-20.  Now it will just be extra."

Notably, Ceasar's statements about her intention to flee to Russia are corroborated by Russian vocabulary cards and educational materials that the FBI found when they searched Ceasar's

abandoned room at the Wolcott Hotel pursuant to a search warrant following her flight.  And as detailed above, the Resident had previously advised the FBI in a June 2021 interview that when Ceasar was living at Hope House Russia was Ceasar's "goal."  During the interview, the Resident conveyed to the FBI that Ceasar's infatuation with Russia may be linked in some fashion to a "husband" Ceasar had identified to the witness as an ISIS supporter and who the witness believed to be "from Russia or somehow involved with Russia."

                   3.      <u>VOSR Charges Nine through Eleven</u>

On September 29, 2021, the Probation Department filed a Supplemental VOSR Report charging the defendant with three additional violations of the conditions of her supervised release relating to her flight to New Mexico: (9) removing her GPS bracelet without the approval of the Court or Probation Department on or about August 25, 2021; (10) leaving the Eastern District of New York without permission on August 27, 2021; and (11) failing to maintain contact with her Probation Officer between August 25 and August 27, 2021.

                   4.      <u>The Defendant Pleads Guilty to the Failure to Appear Offense and to VOSR Charges Four and Nine</u>

Following the defendant's return to the Eastern District of New York in custody, the defendant waived indictment and pleaded guilty pursuant to a superseding plea agreement on October 14, 2022, to an information charging the defendant with willfully failing to appear before the Court as required by the conditions of her release in connection with her Material Support Offense and the Obstruction Offense (the "Failure to Appear Offense") under Docket Number 22-CR-459.   In a revocation hearing immediately following the defendant's guilty plea to the Failure to Appear Offense, and pursuant to the same written plea agreement in which the defendant agreed to plead guilty to the Failure to Appear Offense, the defendant admitted Violation Charge Four, which alleged that between in or about and between December 2020 and

March 21, 2021, the defendant failed to report to Probation that she had downloaded and accessed social media accounts to a cell phone and other Internet capable devices.  The Defendant also admitted Violation Charge Nine, alleging that on or about August 25, 2021, the defendant had removed her location monitoring bracelet without permission.

      G.      <u>The Defendant's Continued Post-Arrest Violations of BOP Rules and Denials of Responsibility</u>

Since returning to the custody of the BOP at the MDC in Brooklyn following her attempted flight, the defendant has resumed her well-established pattern of circumventing BOP communications monitoring regulations and has sought out convicted and accused ISIS supporters both inside and outside the MDC.

      1.      <u>Violating BOP Communications Monitoring Restrictions</u>

Ceasar has been formally disciplined for violations BOP policies on at least four occasions since her return to the MDC, each time for phone abuse, i.e., using another inmate's account or allowing another inmate to use her account to make phone calls, on or about January 9, 2022, October 25, 2022, December 29, 2022, and July 11, 2024.  However, as the FBI has confirmed with BOP, she has violated BOP policy hundreds of times through the following actions: using someone else's account to make phone calls; letting someone use her account to make phone calls; using third-party email services to send text messages;  using third-party email services to receive text messages; using third-party email services to conduct research (to include use of third-party email services to conduct research about ISIS); engaging in three-way telephone calls; and letting someone use her account to send emails.

For example, in violation of BOP regulations, the defendant used a third-party service in December 2021 to send search engine search queries from her BOP email address to the service and, in response, received search engine results for the following queries:

- arwa muthana arrested 2021 ISIS.
- sinmyah amera ceasar 2021 ISIS recruiter
- SEARCH: ARWA MUTHANA ISIS AND SINMYAH AMERA CEASAR ISIS ARRESTED 2021
- search: the mujulis ullama of south africa, port elizabeth, of south africa masjid 2021 saheikh desi islamic center.
- search: shaykh faisal muhammad, jamaica, islamic leader 2021
- search for demetrius jameel morris arrested nyc
- aleah mohammed arrested in nyc 2020 fraud
- black male name fareed, african american and ghanian arrested in NYC by fbi for terriosim case.
- a man name fareed a african american guy arrested on terrorism charges in nyc. 2020

These searches are notable not only because many reveal a continuing interest in ISIS and its supporters (including her own support for ISIS), but also because many of the searches are for individuals with whom the defendant has a personal connection, as described further below.

2.    The Defendant's Continued Efforts to Contact ISIS Supporters

During the period in which Ceasar cooperated with the government following her initial arrest in November 2016, the defendant proffered about her connection to a Jamaican ISIS supporter who uses the name Sheikh Abdullah el-Faisal, or simply Sheikh Faisal.   At the time, the defendant described her communication with Sheikh Faisal as consisting of conversation regarding jihad and hijrah (immigration) to "dawla" ("the State" referring to ISIS) in order to "leave dar ul kufr" (the "land of the kuffar").   The defendant recalled one video in which Sheikh Faisal, accompanied by other UK-based leaders, promoted jihad in their speech and specifically encouraged "killing kuffar."   The defendant advised the FBI that Sheikh Faisal ran Internet-based communications channels through which he delivered lectures that encouraged killing kufr, making hijrah to dawla, and "attacks."   In her own words, the defendant characterized

Sheikh Faisal as a "recruiter for dawla" and someone who helped others make hijrah to ISIS-controlled territory.

Despite this, following her return to the MDC the defendant actively sought to resume contact with Sheikh Faisal. Between November 27 and 29, 2021, the defendant placed three calls to an unidentified woman in Jamaica seeking a phone number and email address for "Abdullah Faisal." The woman provided Ceasar with another Jamaica-based phone number and a fax number. On November 30, 2021, Ceasar called this number and asked several times to speak with "Sheikh Faisal" alleging a desire to connect with family and seeking money. The man on the other end of the phone told her he was no longer in communication with Sheikh Faisal. Notably, Sheikh Faisal was arrested in 2017 in Jamaica on New York State charges that he had solicited or supported an act of terrorism, and extradited to New York on August 12, 2020.[21] On January 26, 2023, a New York State jury convicted Faisal on all counts.[22]

3.    The Defendant's Relationships with Incarcerated ISIS Supporters

Ceasar developed a close friendship with accused (and later, convicted) ISIS supporter Arwa Muthana when Muthana was housed at the MDC. In January 2022, Muthana helped to introduce Ceasar to convicted ISIS supporter Fareed Mumuni[23] through Muthana's

---

[21]    See Ellen Nakashima, "Suspected ISIS cleric Abdullah Faisal arraigned in New York" Washington Post (Aug. 14, 2020), *available at* https://www.washingtonpost.com/national-security/abdullah-faisal-arraignment-islamic-state/2020/08/14/7eae9372-ddc6-11ea-809e-b8be57ba616e_story.html.

[22]    See N.Y. County Dist. Atty., "D.A. Bragg Announces All-Count Trial Conviction of Radical Cleric Shaikh Faisal for recruiting Supporters and Facilitating Efforts to Join ISIS" (Jan. 26, 2023), https://manhattanda.org/d-a-bragg-announces-all-count-trial-conviction-of-radical-cleric-shaikh-faisal-for-recruiting-supporters-and-facilitating-efforts-to-join-isis/.

[23]    Fareed Mumuni "was convicted of, *inter alia*, conspiring to provide material support to the Islamic State of Iraq and al-Sham ("ISIS") and attempting to murder a federal

husband, and co-defendant, accused (and later, convicted) ISIS supporter James Bradley, who was incarcerated with Mumuni.[24]  Ceasar violated BOP regulations to use a third-party search engine service to email search queries about Mumuni, which returned search results with information about Mumuni's conviction on material support charges and the Court of Appeals decision ordering him resentenced.  In recorded telephone calls with the individual identified in this memorandum as the Friend in January 2022, Ceasar announced that she intended to marry Mumuni describing him as a "brother" she is going to marry who is also being "resentenced" just like her.  To make clear that she was referring to Mumuni, the defendant stated on one call to the Friend that his name is Fareed and spelled out his last name, Mumuni.  The defendant explained to the Friend that a "sister who is married" was helping her, and described the sister as Yemeni from Alabama, a description consistent with Arwa Muthana.  Ceasar thereafter provided the Friend's telephone number to Mumuni, who then called the Friend from the MDC.  The "marriage" apparently did not take not take place after the Friend disapproved.

Even after Muthana was moved out of the MDC, the FBI has obtained communications indicating that the defendant has used other inmates' BOP email accounts to attempt to stay in contact with her.  For example, on July 1, 2023, Ceasar wrote one email to an

---

agent in the name of ISIS." United States v. Mumuni Saleh, 946 F.3d 97, 101 (2d Cir. 2019). The district court sentenced Mumuni to 17 years' imprisonment and the government appealed. The Court of Appeals vacated Mumuni's sentence as substantively unreasonable and remanded to the district court for resentencing.  See id.  Mumuni was re-sentenced on May 31, 2022, to 25 years' imprisonment.  See United States v. Mumuni, Dkt. No. 15-CR-392, ECF No. 179 (June 3, 2022).

[24]    Dep't of Justice, "New York City Man and Alabama Woman Plead Guilty to Attempting to Provide Material Support to ISIS" (Sept. 12, 2022), https://www.justice.gov/opa/pr/new-york-city-man-and-alabama-woman-plead-guilty-attempting-provide-material-support-isis.

individual who was previously an inmate at the MDC, in which she wrote that she sent a message to Arwa Muthanna through Sherry Li, another inmate at MDC, with whom Ceasar lives and often shares BOP accounts with against BOP policy.  However, because the defendant violated BOP policy and sent the message from another inmate's email account, presumably to avoid monitoring from the FBI, the government has limited insight into the extent and content of the defendant's ongoing communications with Muthana.

### 4.    The Defendant's Continued Use of Extremist Language and Concepts

During her first sentencing, Dr. Vidino testified that Ceasar's continued use of the word "kuffar" to describe those who held different beliefs, demonstrated that the defendant retained a commitment to extremist ideology.  In reviewing the defendant's recorded telephone calls, the FBI has noted that the defendant continues to use the word kuffar, including for example in calls in March 2022, August 2022, January 2023, May 2023, October 2023, and June 2024.  While the context varies, the defendant's use of the term is invariably derogatory and she continues to use the term to identify those with whom the defendant disagrees.  In some instances, for example, the defendant has used the term "kuffar" along with other slurs to express derogatory views of homosexuals, including to describe a Muslim inmate who was lesbian.

In some of her communications, the defendant has also continued to use aliases, or "kunyas," that she used to identify herself to other ISIS supporters when she was engaged in the commission of the Material Support Offense.  Although kunyas are Arabic epithets routinely used by non-extremists, ISIS supporters use kunyas as a nom de guerre to mask their true identities when communicating with each other.  The defendant used several different kunyas when she was engaged in committing the material support offense, one of which was "Amera Bintu Baseemah Almaghriyya" which roughly translates to Amera Daughter of Baseemah the Moroccan.  An example of her use of the kunya in December 2015 is below in a photo she

posted of a woman firing an assault rifle with the message "Im mujahidah jihad is best thing we

doo" followed by among others, the "100" emoji.



On June 12, 2024, the defendant used her Corrlinks account in violation of BOP policy to send a

text message to another person through a third-party email-to-text service.  In the text message

Ceasar invoked the same kunya, referring to herself as "Amera bintu baseemah almaghriyya".

5.    The Defendant's Continued Communication with Felons

Ceasar also continues to engage in communication with known felons and

individuals previously incarcerated with her at MDC on a near daily basis. There have been

hundreds of calls, most specifically with Jalaal Gould, who has been discussed in several of the

Probation Department's violation reports.  Their calls consist mostly of Ceasar trying to break up

Gould's marriage with his wife so she can marry him, despite their "cousin" relationship.

Monitoring Ceasar's communication proves difficult as she constantly uses other inmate's

accounts.  For example, from May 10, 2024 through May 19, 2024, Ceasar communicated with

Gould's telephone number ten times using four other inmates' communications accounts.

6.     The Defendant's Continued Denial of Accountability

Finally, in recorded phone calls the defendant has continued to deny responsibility

for the misconduct that has brought her before this Court to be sentenced on three separate felony

offenses.  She has repeatedly asserted that her crimes are not serious, or that she is being

persecuted based on her race or religious beliefs.  For example, the defendant made the following

statements during recorded phone calls:

- April 14, 2022: "But some cases they give you too much um probation restrictions that it's kinda impossible to not violate - that's what my situation is. So my attorney is trying to bring it to the judge to modify my probation rules because it's impossible not to violate. Like everything they ask for is like 'oh my gosh' you're gonna violate. You know what I mean? . . . Like I was set up for failure because everything that I was doing they was like a violation. Did you read your, uh, your, what do you call it? Your rules that you were supposed to do? And I was just like, um, I did read it but I guess I didn't like comprehend it as in you must report everything, you know, to probation. I took it as petty, but they took it seriously."

- October 11, 2022: "That's what I'm saying. I'm not even a criminal. That's what I'm saying. Like you know, but it's just like, y'all have – you do got other programs. Y'all can put me in other programs, other types of housing."

- December 4, 2022: "Yeah, and I'm going to explain in my speech, that how being incarcerated does not help me when it comes to me as a Muslim, and it does not help me to get back on my feet to build a foundation to, uh, continue building structure because of the lack of the resources in here and the re-entry programs. Also, how the government is responsible to help me in this type of nature to help me get back into society and to be effective and to prosper. So, I have all those things that it's going to seem like I'm basically struggling in here. Also, it's making it oppressing. You know? As it's as it's still affecting me in just appearance being in this type of FBOP, you know, you know what I mean – like being in the custody of the government. . . . Yeah. So yeah I'm going to make this – I'm telling you – this time around this - it's going to be very like long but it's going to be clear that it's basically not all my fault. [En-heh]. So."

- March 30, 2023: "Exactly. And I'm gonna write to my Judge tonight, and be like, um [inaudible] - - is it because I'm black? Is it because I'm black? . . . Is it because I'm black and I'm Muslim that I'm [inaudible] – that my lawyers can't fight for justice for me while I'm under the, under the custody of um –- of BOP."

II.    THE GUIDELINES SENTENCING RANGE

A.    The Government's Guidelines Calculation

The defendant stands convicted of three separate felony offenses committed on occasions different from one another.  But because the parties have agreed in the October 14, 2022 Plea Agreement to request that the Court conduct a single consolidated hearing to both re-sentence the defendant for the Material Support Offense and the Obstruction Offense and to impose sentence for the defendant's Failure to Appear Offense, the Guidelines grouping rules under U.S.S.G. § 3D1.2(c) and U.S.S.G. § 3D1.3(a), direct the court to determine the offense level applicable to the Group based on the highest offense level of the counts in the Group.  The government submits that the applicable Guidelines range is 360 to 840 month's imprisonment, which is based on a total offense level of 42 and a Criminal History Category of VI.  The resulting range of 360 months' to life imprisonment is restricted by the applicable statutory maximum sentence to 360 to 840 months' imprisonment.  That calculation is as follows:

Docket No. 17-CR-48 Count One: Conspiracy to Provide Material Support to a Foreign Terrorist Organization

| | |
|---|---|
| Base Offense Level (§ 2M5.3(a)) | 26 |
| Plus: Offense involved the provision of material support and resources with the intent that they be used to commit or assist in the commission of a violent act (§ 2M5.3(b)(1)(E)) | +2 |
| Plus: Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Plus: Obstruction of Justice enhancement based on failure to appear (§§ 3C1.1; 2J1.6 cmt. n.3) | +2 |
| Total: | 42 |

<u>Docket No. 19-CR-117 Count One: Obstruction of an Official Proceeding</u>

| | |
|---|---|
| Base offense level (§ 2J1.2(a)(1)) | 14 |
| Plus: Defendant's false statements and concealment of evidence resulted in substantial interference with administration of justice (§ 2J1.2(b)(2)) | +3 |
| Plus: Offense involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects (§ 2J1.2(b)(3)(A)) | +2 |
| Plus: Obstruction of Justice enhancement based on failure to appear (§§ 3C1.1; 2J1.6 cmt. n.3) | +2 |
| Plus: Defendant committed the offense while on bail (§ 3C1.3; 18 U.S.C. § 3147) | +3 |
| Less: Acceptance of responsibility (§ 3E1.1(a)) | -2 |
| Less: Acceptance of responsibility (§ 3E1.1(b)) | <u>-1</u> |
| Total: | <u>21</u> |

<u>Docket No. 22-CR-459 Count One: Failure to Appear</u>

| | |
|---|---|
| Base offense level (§ 2J1.6(a)(2)) | 6 |
| Plus: Underlying offense punishable by more than 15 years (§ 2J1.6(b)(2)(A)) | +9 |
| Plus: Defendant committed the offense while on bail (§ 3C1.3; 18 U.S.C. § 3147) | +3 |
| Less: Acceptance of responsibility (§ 3E1.1(a)) | -2 |
| Less: Acceptance of responsibility (§ 3E1.1(b)) | <u>-1</u> |
| Total: | <u>15</u> |

Because the total offense level of 21 calculated for the Obstruction of Justice Offense and the total offense level of 15 for the Failure to Appear Offense are both more than nine levels less serious than the total offense level of 42 calculated for the Material Support

Offense, the offense levels for the Obstruction of Justice Offense and the Failure to Appear Offense do not increase the applicable offense level for purposes of determining the defendant's Guidelines sentencing range.  See U.S.S.G. § 3D1.4(c).

Thus, the combined offense level is 42.  Notably, the defendant stipulated as part of her March 2019 plea agreement that her combined offense level was 40, see Mar. 2019 Plea Agreement ¶ 4, and further acknowledged as part of her October 2022 plea agreement that the subsequent Failure to Appear Offense added two levels to the Material Support Offense and therefore to her combined offense level for a total offense level of 42, see Oct. 2022 Plea Agreement ¶ 3.

The defendant's Criminal History Category for the Material Support Offense is set at VI as a result of the application of the terrorism enhancement.  As the government explains in further detail below, the terrorism enhancement (U.S.S.G. § 3A1.4(a)) reflects Congress's intent that individuals convicted of terrorism offenses, like the defendant, serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present.

Based upon the offense level of 42 and Criminal History Category of VI, the advisory Guidelines sentencing range is 360 months' to life imprisonment.  However, the statutory maximum sentence for the defendant's offenses is 840 months' imprisonment. Specifically, the statutory maximum sentence for the Material Support Offense is 240 months' imprisonment under 18 U.S.C. § 2339B(a)(1), the statutory maximum sentence for the Obstruction of Justice Offense is 240 months' imprisonment under 18 U.S.C. § 1512(c)(1), the statutory maximum sentence for the Failure to Appear Offense is 120 months' imprisonment under 18 U.S.C. § 3146(b)(l)(A)(i), and, for committing the latter two felonies while under

71

pretrial release, the defendant is also subject to two additional terms of up to 120 months' imprisonment authorized under 18 U.S.C. § 3147, which must be imposed consecutive to any other sentence of imprisonment.[25]  Thus, the defendant's restricted Guidelines sentencing range is 360 to 840 months' imprisonment.  See U.S.S.G. § 5G1.2(d).

      B.    The Government's Disagreement With Probation's Guidelines Calculation

      The principal difference between the government's Guidelines calculation and the Probation Department's calculation set forth in the PSR rests in the treatment of the Obstruction Offense.  The PSR determined that the defendant's obstruction was of the investigation or prosecution of the underlying Material Support Offense, and therefore calculated the Guidelines for the Obstruction Offense based on the Guidelines for the underlying Material Support Offense.  However, in the Information in Docket No. 19-CR-117, the government charged the defendant with destroying Facebook and text messages in order to impair their availability for

---

[25]     In her objection to the PSR, the defendant challenged the application of the additional consecutive term of imprisonment of up to 120 months' imprisonment required by 18 U.S.C. § 3147(1) for the defendant's Failure to Appear Offense.  See, e.g., Dkt 17-CR-48, ECF No. 211 at 2-3.  The government responded to that objection in its Sept. 6, 2024 letter, see, e.g., Dkt. 17-CR-48, ECF No. 3-4.  The defendant did not raise the objection in her sentencing submission.  As noted in the government's response letter, by its plain language, 18 U.S.C. § 3147(1) requires the Court to impose an additional consecutive sentence of up to 10 years' imprisonment on any person who commits a felony offense while released under Chapter 207 of Title 18 of the United States Code, and it does not exclude the failure to appear offense under 18 U.S.C. § 3146.  As noted by United States v. Chuong Van Duong, 665 F.3d 364, 366-67 (1st Cir. 2012), "the statutory language is plain and unambiguous" and each circuit court of appeals to consider the question has rejected the defendant's argument that the additional consecutive sentence of up to ten years required by § 3147(1) does not apply if the felony of conviction is a felony violation of § 3146.  See id. (noting that "all five courts of appeals that have considered this question have reached the same conclusion" and citing United States v. Rosas, 615 F.3d 1058, 1064 (9th Cir. 2010); United States v. Dison, 573 F.3d 204, 207–208 (5th Cir. 2009); United States v. Fitzgerald, 435 F.3d 484, 486 (4th Cir. 2006); United States v. Clemendor, 237 F. App'x 473, 478 (11th Cir. 2007) (per curiam); United States v. Benson, 134 F.3d 787, 788 (6th Cir. 1998)).

use in official proceedings, specifically a bail proceeding and a sentencing proceeding in the

Eastern District of New York.  See Information, No. 19-CR-117, ECF No. 5.  While the

sentencing proceeding referred to in that Information was the Material Support Offense

sentencing proceeding, the government nevertheless did not treat the Obstruction Offense as an

obstruction of the investigation or prosecution of the Material Support Offense.  As a result, the

government did not calculate the Guidelines in the defendant's plea agreement for the

Obstruction Offense with reference to the underlying Material Support Offense.  Nor did the

government seek to apply the terrorism enhancement to the Obstruction Offense or seek to

increase the defendant's Criminal History Category to VI for the Obstruction Offense.  Rather,

the government treated the Obstruction Offense as substantial interference with the

administration of justice based on the destruction of numerous documents and other records, and

calculated the Guidelines accordingly.  These calculations were included in the defendant's plea

agreement.  For these reasons, the government respectfully submits that the calculation set forth

above is the correct calculation for the Obstruction Offense, rather than the calculation set forth

in the PSR.

     C.    <u>The Court Should Reject or Disregard the Defendant's Guidelines Objections</u>

     The defendant raises several objections to the sentencing scheme, including the

application of the terrorism enhancement, and the denial of credit for acceptance of

responsibility.

     Although not a Guidelines issue, the defendant complains that the government's

Guidelines analysis distorts the sentencing scheme far beyond what Congress intended.

Specifically, the defendant argues that the statutory sentencing range for the Material Support

Offense ranges from 0 to 240 months' imprisonment, and that the government should not be

permitted to use the additional statutory ranges applicable to the other offenses to advocate for a

sentence above the top of the statutory range for the Material Support Offense.  Def. Br. at 38-39.

Here, the government does not seek to use the statutory sentencing scheme to circumvent the 20-year cap on the Material Support Offense.  Rather, as the government explains in more detail below, the defendant's combination of offenses, including the Material Support Offense, the Obstruction Offense, the Failure to Appear Offense, and the various violations of pretrial and supervised release show a pattern of conduct and disregard for complying with court orders that warrants a significant sentence within the advisory Guidelines range.  Pursuant to Section 5G1.2, the Court is authorized to impose such a sentence.  Specifically, Guidelines Application Note 3(A) to U.S.S.G. § 5G1.2(b), provides that:

> the court shall determine the total punishment (i.e., the combined length of the sentences to be imposed) and shall impose that total punishment on each such count, except to the extent otherwise required by law (such as where a statutorily required minimum sentence or a statutorily authorized maximum sentence otherwise requires).

In circumstances where the applicable Guidelines range is higher than the count carrying the highest statutorily authorized sentence, such that "the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment," then the Guidelines provide that "the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."  U.S.S.G. § 5G1.2(d).

The defendant relies on United States v. Pugh to argue that the government is not permitted to use the statutory maximum sentencing schemes available for other crimes of conviction to seek a sentence above the statutory maximum sentence for a terrorism offense. Def. Br. at 39.   But Pugh does not help the defendant's argument.  In that case, Judge Garaufis initially sentenced Pugh to 180 months' imprisonment (the then-statutory maximum sentence)

74

for attempting to provide material support to ISIS and 240 months' imprisonment (also the statutory maximum) for obstruction of justice, for a total of 420 months' imprisonment, which was within the advisory Guidelines range of 360 to 420 months' imprisonment.  United States v. Pugh, 945 F.3d 9, 16, 25 (2d Cir. 2019).   The Second Circuit vacated the sentence because it found that Judge Garaufis had failed sufficiently to explain the sentence he had imposed.  Id. at 26-28.  Speaking only for himself, Judge Calabresi authored a concurrence in which he expressed the view that the 20-year sentence for the obstruction count seemed incongruous because that crime was much less grave that the material support count for which Judge Garaufis imposed a 15-year sentence.  Id. at 29 (Calabresi, J., concurring).  That statement did not speak for the panel.  On remand, Judge Garaufis again imposed a 180-month sentence on the material support count and a 60-month sentence on the obstruction count.  Defendant again appealed.  This time, the Second Circuit affirmed the sentence.  United States v. Pugh, 2024 WL 1253082, at *1 (2d Cir. Mar. 25, 2024).  The Second Circuit noted specifically that Judge Garaufis's explanation was sufficient to show why a sentence equal to the statutory maximum on the material support count would not produce a sufficient sentence, and therefore that the district court properly sentenced Pugh to the statutory maximum sentence for the attempted material support conviction and also properly sentenced Pugh to an additional term of imprisonment, to run consecutive to the material support sentence, for obstruction of justice.  Id. at *1-2.  Here, the government seeks the same type of sentence—one that imposes the statutory maximum sentence for the Material Support Offense and then additional sentences for the other offenses, to run consecutively to the sentence imposed for the Material Support Offense in order to achieve a Guidelines sentence.  The Second Circuit affirmed precisely that approach in Pugh.

Next, the defendant complains that the potential for a sentence that exceeds the 20-year cap for the Material Support Offense is created by the application of the terrorism enhancement. Def. Br. at 39-40. Specifically, the defendant argues that the terrorism enhancement is not backed by empirical evidence and fails to give individualized consideration to the defendant.

Far from circumventing Congressional intent, however, the terrorism enhancement is in fact the result of legislation passed by Congress in 1994 that mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. See United States v. Stewart, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's intent that individuals convicted of terrorism offenses, like the defendant, serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present. As Judge Walker explained in his concurrence in Stewart:

> The import of this enhancement "could not be clearer": It reflects Congress' and the [Sentencing] Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

Id. at 172-73 (quoting United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003)). As the Second Circuit explained in Meskini, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Meskini, 319 F.3d at 92. Thus, the effect of the terrorism enhancement on the applicable Criminal History Category reflects the Sentencing Commission's assessment of the

high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed.  See Stewart, 590 F.3d at 143 (citing Meskini, 319 F.3d at 92).

The Court should reject the defendant's challenge to the terrorism enhancement. As an initial matter, the defendant does not dispute that the terrorism enhancement applies to her conduct; indeed, the defendant does not object to the 12-level enhancement to the offense conduct for the Material Support Offense based on the application of the terrorism enhancement.[26]  Indeed, the defendant stipulated in the October 2022 plea agreement to the applicability of the terrorism enhancement.[27]  The defendant's current argument that the Criminal History Category should not be VI is a breach of her stipulations in the October 2022 plea agreement as well as foreclosed by the Mandate Rule.  The defendant conceded the application of the terrorism enhancement to her Material Support Offense and the resulting finding that she falls within criminal history category VI, at her original sentencing, see Sent. Tr. 348-49 ("THE COURT: What does the guideline call for? MR. RICHARDSON: The

---

[26]    Pursuant to the terrorism enhancement, the defendant's offense level is enhanced by 12 levels and her Criminal History Category is set at VI.  See U.S.S.G. § 3A1.4(a).

[27]    The defendant's argument that the March 2019 plea agreement contained a stipulation that the criminal history category for the Material Support and Obstruction Offenses was Category I (Def. Br. at 40) ignores that on April 15, 2019, approximately one month after the March 2019 plea, the government sent the defendant a letter clarifying that its estimate of Criminal History Category I was incorrect and that the defendant was in fact in Criminal History Category VI by application of the terrorism enhancement.  See Docket No. 17-CR-48, ECF No. 94.  The defendant never sought to withdraw her plea or otherwise disputed that her Criminal History Category was VI.  Moreover, the defendant's argument that the October 2022 plea agreement reflected that her Criminal History Category was II ignores that the agreement specified that such Criminal History Category was specific to the Failure to Appear Offense. The plea agreement further explained that the defendant fell within Criminal History Category VI for the Material Support Offense.  Oct. 2022 Plea Agreement ¶ 3.

determination the Government and defense agree on is that the Defendant's combined offense level is a Level 40, under the terrorism enhancement her Criminal History Category is set at VI, and that produces a guideline sentencing range of 360 to 600 months imprisonment, restricted by statutory maximums. THE COURT: Do you agree? MS. VON DORNUM: We agree that is the guidelines calculation, your Honor."), failed to dispute it on appeal though both the district court and the court of appeals relied upon that determination, see United States v. Ceasar, 388 F. Supp. 3d 194, 218 (E.D.N.Y. 2019), vacated and remanded on other grounds by United States v. Ceasar, 10 F.4th 66, 69 (2d Cir. 2021) ("Ceasar faced a Sentencing Guidelines range of 360 to 600 months' imprisonment"), cert. denied, 142 S. Ct. 2841 (2022), and then stipulated to it again in her third plea agreement, see October 14, 2022 Plea Agreement ¶ 3.  The determination that her criminal history category is VI as a result of her Material Support Offense is res judicata, and the reconsideration of that determination is both prohibited by the Mandate Rule, "a branch of the law-of-the-case doctrine that rigidly binds the district court, barring it from considering issues explicitly or implicitly decided on appeal," United States v. Aquart, 92 F.4th 77, 87 (2d Cir. 2024) (internal quotation marks omitted), and contrary to her own Guidelines stipulation which she made following the Second Circuit's remand.

In any event, the defendant's argument about the terrorism enhancement overstating the defendant's criminal history appears to be irrelevant.  The defendant asks this Court to depart or vary to Criminal History Category II.  Def. Br. at 40.  Even with Criminal History Category II, an offense level 42 results in a Guidelines range of 360 months to life imprisonment, the same as the Guidelines range for offense level 42 and Criminal History Category VI.

Finally, the defendant challenges the PSR's denial of credit for acceptance of responsibility points for both the Obstruction Offense and the Failure to Appear Offense. The government notes that there is no dispute that the defendant receives no credit for acceptance of responsibility for the Material Support Offense, for which she breached her cooperation agreement. The defendant's plea agreements with the government included three-point reductions for acceptance of responsibility for each of the Obstruction and Failure to Appear offenses. Each of those agreements specified, however, that the three-point reduction was conditional, based on the defendant's acceptance of responsibility "through allocution *and subsequent conduct prior to the imposition of sentence*." Although the defendant has pleaded guilty to these three separate felony offenses as well as multiple violations of supervised release conditions, the Court could conclude that her continued efforts to reach out to individuals associated with terrorist organizations (which is something she has done throughout this case) could, under Guidelines Section 3E1.1 cmt. n.1(B), constitute a failure to "voluntary[ily] terminat[e] or withdraw[] from criminal conduct or associations." Nevertheless, the government is not arguing that the defendant should be denied these reductions for acceptance of responsibility; rather, as set forth below, the government contends that the defendant's conduct in continuing to engage in criminal activity and in continuing to associate with individuals associated with terrorist organizations is highly relevant to the Court's determination under Section 3553(a) what sentence to impose.

In any event, however, the government notes that the Court need not address this Guidelines issue at sentencing. In light of the Guidelines grouping principles discussed in the defendant's October 14, 2022 plea agreement, and the defendant's stipulation to that Guidelines analysis, the determination whether the defendant's subsequent conduct should result in the

denial of reductions for acceptance of responsibility will not affect the sentencing range

recommended by the Guidelines.  That range is determined by the Material Support Offense and

is not affected by whether the Court grants the defendant three points credit for acceptance of

responsibility for either the Obstruction Offense or the Failure to Appear Offense.  Therefore, it

is not a dispute that the Court needs to resolve because it will not affect sentencing.  See Fed. R.

Crim. P. 32(i)(3)(B); cf. United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) (recognizing

that resolution of disputed Guidelines questions is not necessary if the two possible Guidelines

sentencing ranges implicated by the dispute overlap and the district court decides to impose a

sentence within the overlapping range regardless of the resolution of the dispute), abrogated in

part on other grounds by United States v. Fagans, 406 F.3d 138, 142 (2d Cir. 2005).[28]

     D.     Consecutive Sentences and the Interaction with the Supervised Release Violations

     The defendant argues that she should receive no additional time for her multiple

violations of supervised release.  The Court should reject that argument because a sentence for

the violations of supervised release punishes the defendant's breaches of the Court's trust in

committing those violations.  See United States v. Ramos, 979 F.3d 994, 1002 (2d Cir. 2020)

(citing United States v. Edwards, 834 F.3d 180, 194 (2d Cir. 2016)) (the sentence imposed by the

Court for a violation of supervised release should be fashioned to "primarily sanction the

defendant's 'breach of trust,' not the conduct constituting the violation itself").

--------

[28]     The defendant appears to criticize the government for the position that the Court
need not decide this issue, in arguing in its sentencing submission that it is necessary for the
Court to correctly determine the Guidelines calculation.  Def. Br. at 38.  The government's point,
which the defendant appears not to understand, is that it does not matter how the Court resolves
that particular issue because, whether the Court gives or denies a three-level reduction for
acceptance of responsibility, in neither event does the resolution of that issue affect the actual
Guidelines calculation.

Notably, the plea agreement envisions a consolidated sentencing proceeding for the Material Support, Obstruction and Failure to Appear Offenses, and commits the government to advocating for a sentence within the Guidelines range for those three offenses. The plea agreement does not contemplate the violations of supervised release offenses being encompassed within those sentences, nor does the plea agreement limit the government from advocating for a separate, additional sentence for the defendant's violations of supervised release. Indeed, such an additional sentence would be appropriate for the flagrant and repeated violations which the defendant has committed.

Moreover, the Court should impose a consecutive sentence for the defendant's supervised release violations. If the sentence imposed for the violations were to run concurrently with the sentences for the Material Support, Obstruction and Failure to Appear Offenses, then there would be no separate and distinct sanction for the defendant's multiple violations of the Court's trust. See generally U.S.S.G. Ch. 7, Pt. A (Introduction), Sec. 3(b) ("as a breach of trust inherent in the conditions of supervision, the sanction for the violation of trust should be in addition, or consecutive, to any sentence imposed for the new conduct.").

III.    THE COURT SHOULD IMPOSE A GUIDELINES SENTENCE FOR THE
        MATERIAL SUPPORT, OBSTRUCTION AND FAILURE TO APPEAR OFFENSES

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining that sentence, this Court

must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

Here, the statutory sentencing factors call for a sentence within the Guidelines.

A.    <u>The Nature and Seriousness of the Defendant's Conduct, the Need for Just Punishment and the Need to Protect the Public From the Defendant Warrant a Guidelines Sentence</u>

1.    <u>The Material Support Offense</u>

The defendant's Material Support Offense is unquestionably serious. For nearly a year, the defendant devoted herself to and worked on behalf of ISIS, encouraging and attempting to assist in the extreme violence it perpetrates by providing recruits to the group. And she put her devotion to ISIS's violent ideology into action by attempting to travel to join the group herself; an attempt that resulted in her arrest.

The defendant was not merely spewing hate from a basement computer or fantasizing about imaginary ties to ISIS while never actually doing anything to support the group. On the contrary, she was actively involved in recruiting for it. She was, by her own admission, an "assistant" to ISIS and a "good router" who could get ISIS supporters in the United States in touch with the right people abroad. <u>See</u> PSR ¶ 42. The defendant's own contact information was found on the cell phone of a confirmed ISIS facilitator abroad. She even received payment from an overseas ISIS facilitator for doing "big work." <u>See</u> PSR ¶ 33.

And while her Material Support Offense did not result in a terrorist attack, it is clear the defendant knew she was operating in world and with people where catastrophic

violence was not only possible, but often the express goal of the assistance she was providing. When Facebook User 1 posted that "I would love to die has a Shaheed it a big honor," the defendant instructed him, "then do hijrah" and then connected him to ISIS Operative 1, an individual whom the defendant believed to be in Libya and who wanted to help people travel to join ISIS.

Reckoning with the severity of the offense requires understanding the context in which the defendant committed it. In her role as an ISIS recruiter, the defendant worked with extremely dangerous people. For example, she connected "Abu Talib," a potential recruit, to Abu Isa, a confirmed ISIS plotter who the defendant herself called the "head master for the mujahideen" and who, before he was killed in an airstrike, helped plan thwarted attacks to blow up the New York City subway system and attack people with knives. The defendant also connected an individual identified in the government's June 2019 sentencing submission as Individual 2, a convicted violent felon, to two ISIS facilitators, one of whom encouraged Individual 2 that "it would be better for u to do work there," meaning take action in the United States, to "scare them."

Moreover, throughout the period the defendant was posting and writing ISIS propaganda and recruiting for the group, she was keenly aware of the group's commission and encouragement of extreme violence. And she supported it. In her plea allocution, the defendant acknowledged her familiarity with the March 22, 2016 terrorist attacks in Brussels, for which ISIS claimed responsibility. Those attacks, bombings of a metro station and an airport, killed 32 people and injured hundreds.[29] Just a few weeks later, the defendant was assisting Abu Talib to

---

[29]    See https://www.bbc.com/news/world-europe-35869985.

make hijrah to ISIS-controlled territory by connecting him to Abu Isa.  She knew the risk this posed.

At another example, at approximately 8:30 p.m. on September 17, 2016, a homemade explosive device detonated on West 23rd Street in the Chelsea neighborhood of Manhattan, injuring numerous people and causing significant property damage.  The bomb was planted by Ahmad Khan Rahimi, who also planted a similar device which exploded earlier that day in New Jersey, as well as another device in Chelsea which failed to detonate.[30]  On February 13, 2018, U.S. District Judge Richard Berman sentenced Rahimi to two terms of life imprisonment following his conviction at trial for setting off weapons of mass destruction and using explosives in furtherance of a violent crime.[31]

At approximately 1:30 p.m. on September 18, 2016, less than 24 hours after the Chelsea explosion, the defendant sent news of the bombings, and her support for them, to one of her ISIS contacts abroad.  PSR ¶ 36.  Specifically, using her "Rita Daoudii" account on an Internet messaging application, the defendant exchanged messages with Centre, one of the ISIS facilitators abroad with whom she worked and praised the attack.

The defendant's immediate reaction to a violent terrorist attack in the city she lived was not empathy or concern for the victims or even to question her support for ISIS.  Instead, the defendant tried to verify with one of her ISIS facilitators that the attack was ISIS-related.  When she was told "sure," she celebrated with the phrase, "Allahu Akbar" or "God is

---

[30]    See https://www.nbcnews.com/storyline/ny-nj-bombings/terror-timeline-ny-nj-bombings-first-blast-arrest-n650716.

[31]    See https://www.nytimes.com/2018/02/13/nyregion/bomber-chelsea-manhattan.html.

great."  The defendant was rooting for the attack to be ISIS-related and reveling in the news that it was.  Then, when Centre asked for local news coverage of the bombings, the defendant eagerly provided it.

 Later that same day, an individual identified in the government's June 2019 sentencing submission as Facebook User 4 (another U.S.-based supporter of ISIS with whom the defendant was in frequent contact) asked the defendant via an Internet messaging application whether the bombings were done by "our people," meaning ISIS.  The defendant wrote back, "My people saying they will check it out."  The next day, the defendant followed up and wrote back "Yes it was ISIS…..Allahu Akbar….They told me…He did it bombing NJ nyc….Allah Akbar…..Takbeer [the best]…"

Then, on September 19, 2016, the defendant posted to one of her Facebook accounts taking pride in the group's association with the bombing, venerating the perpetrator and condemning as unfaithful Muslims anyone who may have assisted law enforcement in the investigation.

The defendant displayed a similarly chilling reaction following the June 12, 2016 massacre at the Pulse Nightclub in Orlando, Florida, which killed 49 people and wounded dozens more.  As was widely reported at the time, during the attack on the gay nightclub the shooter called 911 and pledged his allegiance to ISIS.[32]  Within days of the attack, the defendant celebrated the shooting and linked it to her own extremist beliefs and association with ISIS.  In

---

[32]     See https://www.washingtonpost.com/news/post-nation/wp/2016/06/12/orlando-nightclub-shooting-about-20-dead-in-domestic-terror-incident-at-gay-club/?utm_term=.dd9151482cec.

one post on or about June 15, 2016, the defendant wrote "I seen 2 gay men on train and thought of Florida shooting and I wanted to blow them up…Baqiyya." PSR ¶ 18.

Understanding the term "Baqiya" is critical here. It is a term commonly used as a greeting among ISIS supporters in conjunction with the phrase "Dawlatul Islamiya" and one which the defendant used in 2016 and to which she continued to gravitate.[33] Baqiya, or "remaining" is a concept that has been part of a concerted messaging campaign by Islamic State propagandists, and adopted by its followers, that the caliphate remains despite the many territorial losses suffered by the group. As early as 2015, when campaigns against ISIS were well underway, *baqiyah* slogans were deployed as a sign of resistance and as a message to followers/supporters to stand firm in the wake of territorial losses. *Baqiya wa tatamaddud*, or "remaining and expanding," was one prominent iteration of this messaging campaign, which drew particularly on ISIS's affiliates in countries outside of Syria and Iraq as a sign that it was not only remaining, but expanding. In other words, in the wake of brutal massacre by a man who explicitly linked himself and his attack to ISIS, the defendant expressed her support for the attack and its relation to ISIS's core "Baqiya" message of violent expansion and to her own desire, in this instance, to kill gay people in the name of Islam.

If the defendant's message were not clear enough, she wrote in another Facebook post after the Orlando attack that "Dawla," ISIS, was doing "their thing" referring to the murder of 49 innocent people. As the defendant was championing these ISIS-inspired attacks, she was actively working for ISIS as a facilitator or, in her own words, an "assistant." She knew the

---

[33]    While on presentence release in 2018, the defendant friended a Facebook account that expressed public support for ISIS and contained the word "baqqiya" on the profile page.

group engaged in extreme violence, she celebrated that violence and she encouraged and assisted others in attempting to join the group to perpetrate more violence.

But the defendant's support for ISIS was not limited to and did not end with her efforts to connect others to ISIS facilitators and to encourage them to travel to join the group overseas. Beginning just days after she celebrated Ahmad Rahimi's bombing in New York City as an ISIS terrorist attack, the defendant sought assistance from another contact in late September 2016 to leave the United States to join ISIS in Syria. See PSR ¶¶ 37-39. In her communications with an ISIS facilitator overseas, the defendant sought money to fund her travel. As the ISIS facilitator explained that the defendant needed to get married when she made it to Turkey to "stabilize" her, the defendant acknowledged the instruction but then told the ISIS facilitator "I rather just do Jihad and meet Allah[.] I am tired of duniya [worldly life]," prompting the ISIS facilitator to reproach the defendant, "[w]ell you ain't gotta be so explicit." PSR ¶ 38. But the defendant just doubled down, making clear that her goal was to fight and die for ISIS, telling the ISIS facilitator she would "rather wait until Janna [paradise]" and "I rather fight for Allah and be shahida [martyr]." PSR ¶ 38. In a Facebook post on November 9, 2016, the defendant made clear her plan to "be out of USA" by late January 2017. PSR ¶ 40.

As detailed above, the defendant attempted to travel out of the United States less than a week after her November 9 Facebook post on a flight that was to be the first leg of a journey that would see her married to a Swedish ISIS supporter with whom she would make hijrah to ISIS controlled territory. See Feb. 10, 2017 Plea Tr. at 27. As discussed above, information provided to the FBI in 2024 by the defendant's Swedish ISIS-supporting betrothed, Hasan Akgun, corroborates and confirms her contemporaneous statements to other ISIS supporters and the defendant's own admission in her plea allocution that the purpose of her

travel, prevented only by her arrest, was to join ISIS.  Echoing the defendant's own

contemporaneous statements to the ISIS facilitator in September 2016, Akgun reported that the

defendant wanted to join ISIS and fight, and that she "want[ed] kuffar to be dead."

      In short, the defendant's Material Support Offense is indisputably serious because

of the harm it threatened, and it should be treated as such.

     2.    The Obstruction Offense and Failure to Appear Offense

      The defendant's obstruction of justice and subsequent flight from prosecution

while under this Court's supervision are similarly serious, both because each of the offenses

standing alone represents a serious crime, but also because of the context in which the defendant

committed them.  The defendant committed each crime to avoid accountability for her continued

misconduct.  First, she obstructed justice by deleting evidence that demonstrated she had violated

the conditions of her bail by re-contacting some of the very same supporters of ISIS and violent

extremist ideologies against whom she had been cooperating.  Later, she attempted to flee the

United States after learning that the government and the Probation Department had evidence that

she had continued to violate the conditions of her supervised release and that the Court of

Appeals had vacated her 48-month sentence as shockingly low, telling her Friend that she had

decided she would not go to prison.

      As set forth above and in the PSR at ¶¶ 44-50, while on presentence release, the

defendant deleted at least 1,000 Facebook messages with numerous individuals.  She did so for

the explicit purpose of hiding them from this Court and from the government.  The offense is

particularly concerning because the underlying conduct – engaging in contact with individuals

she was not supposed to talk to, including people she herself had identified as ISIS supporters –

hues so closely to her Material Support Offense.  Indeed, because she failed to delete all of her

messages, and because the government was able to obtain certain messages through other means,

the evidence shows that the defendant on at least two occasions during this short period used her ISIS kunya "Umm Nutella" to contact others, including an ISIS supporter. And the evidence shows that, when asked repeatedly during the January 2019 Interview about whether she had used the name which she herself admitted indicated her support for ISIS, the defendant intentionally lied about it. There is no question this offense is serious, particularly because her commission of the offense showed that – despite telling the Court she had reformed from her commission of the Material Support Offense – she in fact continued to work to further ISIS's goals.

But the defendant's efforts to escape accountability did not end with the Obstruction Offense. Once released to the supervision of the Probation Department in 2020, the defendant regularly circumvented the monitoring conditions that Judge Weinstein had imposed to ensure that the government and Probation would know what she was doing—and with whom she was communicating—on the Internet. As the government's investigation of her numerous supervised release violations showed, the defendant regularly lied to and misled her probation officer about her activities and deleted applications and messages that she knew would expose her noncompliance. See PSR ¶¶ 56-95. All of this culminated in the defendant's attempt to flee the country in what she freely acknowledged was an effort to evade accountability—prison time—for her actions. See PSR ¶¶ 51-55. In the time that the defendant has been in custody since her most recent arrest, she has only emphasized this conclusion by continuing to deny responsibility for her crimes, casting herself as the victim of government oppression.

The Obstruction and Failure to Appear Offenses were serious crimes committed by the defendant to evade accountability for her misconduct, but as the facts detailed in this memorandum make clear, they were hardly isolated occurrences. These offenses and the

circumstances of their commission demonstrate that the defendant is, and should be sentenced as, a recalcitrant, persistent offender.

      B.    <u>The Defendant's History and Characteristics Support a Guidelines Sentence</u>

What brought the defendant before this Court is clear. Her criminal conduct, her support for ISIS and her adherence to a violent extremism bent on death and destruction, is all set forth above, often in the defendant's own words. The central question now is: what sentence is necessary to, above all, protect the public and promote respect for the law. A significant part of the answer lies in the defendant's history and characteristics, particularly as revealed through her recidivist criminal conduct since she first pled guilty to the Material Support Offense, and the remarkable consistency in the defendant's pattern of misconduct over the last eight years. As discussed below, the defendant's traumatic personal history is a mitigating factor, but it cannot outweigh the seriousness of the defendant's multiple crimes, and the need to protect the public from further crimes of the defendant.

Throughout 2016, the defendant's prolific social media posts and messages provided a window onto her twisted worldview, with support of ISIS at its rotten core. The defendant's writings – and her hours of post-arrest interviews with the FBI – reveal an ideology built around "us" versus "them," with the "us" being ISIS and its supporters, the true believers, and everyone else being the kuffar, or unbelievers. As discussed in his expert report submitted to the Court in connection with the defendant's first sentencing, and as he elaborated on during his testimony at the sentencing hearing, <u>see</u> Sent. Tr. 27-37, Dr. Vidino describes the "commonly cited signs" that experts look for in assessing an individual's disengagement from terrorism. Vidino Rpt. at 21. While not an exhaustive list, these indicators are:

- Ending personal involvement in terrorism and related activities;

- Distancing oneself from terrorism and extremist activity by acknowledging the shortcomings of their actions;
- Distancing oneself from the group's ideology;
- Breaking contact with individuals associated with the group or supporting its ideology; and
- Accepting the punishment for crimes committed

Id.

In the John Doe case, when grappling with the issue of how to assess a terrorist defendant's likelihood of turning "back to radicalization," Judge Weinstein heard testimony from two experts who identified several of the same factors as Dr. Vidino. See United States v. John Doe, 323 F. Supp. 3d at 378-83. Factors common to all three of these experts – one of whom testified for the defense – were the importance of voluntary disengagement from the terrorist organization, cooperation with law enforcement and a willingness to confront the ideology. See id. at 378-81.

In John Doe, Judge Weinstein agreed with the experts and found that "the defendant has recognized the severity of his crimes and is not likely to move towards violent extremist behavior" and that the defendant "appeared credible and forthright at sentencing about his intention to leave his radical past behind and his desire to live a normal life." Id. at 391. This was based on, inter alia, John Doe's voluntary surrender to law enforcement, his admission of remorse for his crime, his four years' of consistent and substantial cooperation with the government and his public appearances disavowing and condemning ISIS and his work discouraging others from doing the same. Id.

The comparison is here stark. The defendant has exhibited none of the positive factors relied on by Judge Weinstein in deciding to sentence John Doe to an extended term of probation. Indeed, the defendant here was given several unique opportunities, rarely afforded to defendants in terrorism cases, when she was first released on bail, and later after she completed

her term of imprisonment and released to the supervision of Probation. She had the chance to show the Court she has changed, that she accepts responsibility for her criminal conduct, that she rejects her prior violent ideology, and that she is capable of choosing a different path.

The Court would face a far more difficult balancing question now had the defendant availed herself of the dozens of opportunities that the defendant has been afforded over the last eight years to demonstrate her sincere desire to conform her conduct to law and earn the Court's trust. But she did not. She has shown no contrition, taken no responsibility for her conduct, and failed to separate herself from the extremist world she reveled in before her 2016 arrest. Instead, as set forth above, she has taken advantage of the Court.

At her sentencing in 2019, the defendant made a statement in which she swore to Judge Weinstein that she had changed and that she would follow the rules. Sent. Tr. at 341-343. Though the defendant had already repeatedly violated the Court's trust through her widespread violations of the conditions of her bail and the fact— unprecedented in a terrorism prosecution— that she had already committed a new felony offense, Judge Weinstein chose to believe the defendant and gifted her the opportunity to show she could be trusted to make good on her promises. The defendant went on to repeatedly violate the Court's trust, worked to conceal the violations of the conditions of her supervised release and committed an unprecedented *second* new felony offense when she tried to flee the country to escape accountability for her crimes.

There can be no doubt about what the defendant will do if given the 10-year sentence she now requests, a term that would see her serve less additional time than the 48 months to which Judge Weinstein first sentenced her and which the Court of Appeals found to be shockingly low. During her release on bail and then again after completing the 48-month term Judge Weinstein imposed, the defendant utterly disregarded this Court's orders regarding first

her bail conditions then her supervised conditions to connect and seek to connect with numerous people she herself identified as ISIS supporters, including by using her ISIS name "Umm Nutella," hunted for the same ISIS propaganda that she promulgated before, repeatedly expressed a total lack of remorse or acceptance of responsibility for her conduct, intentionally destroyed evidence to avoid detection and then, when given the chance to explain herself, repeatedly lied. See Sent. Tr. 29-37 (Testimony of Dr. Vidino in 2019 identifying red flags in the defendant's statements and actions supporting his "assessment [] that she retains the mindset of ISIS"). At every turn, the defendant has demonstrated she cannot be trusted and remains a threat to return to her old ways.

What is most striking, and should most concern the Court, is that the defendant continues to espouse the same extremist, "us versus them" sentiments while also denying responsibility for her crimes, contacting and attempting to contact ISIS supporters and seeking out more ISIS propaganda, and then covering it up and lying about it. As Dr. Vidino explained in 2019, the defendant "repeatedly argues that the behaviors she engaged in in support of ISIS might be illegal under US law but, at the same time, are simply manifestations of good *deen*, of correct adherence to Islamic creed." Vidino Rpt. at 27. In his 2019 expert report Dr. Vidino pointed to several exemplars of this, including the following:

- The Facebook post from the defendant while she was on bail in June 2018 in which she wrote: "I didn't do anything wrong under Islam but stand up for my deen and got arrested for what I believe in. See Exhibit 14.

- A February 22, 2019 email from the defendant in which she "America a is hard for Muslims to live if you want to practice deen ul islaam."

- A February 28, 2019 email in which the defendant wrote "I understood that United States don't like certain religious beliefs and don't allow you to exercise certain beliefs."

In 2019, Dr. Vidino described these and other similar recent statements of the defendant this way:

> These statements do not indicate any abandonment of ISIS' worldview. Rather, they strongly suggest that the defendant believes that adopting ISIS ideology and acting in its furtherance constitute correct Islamic behavior, following one's *deen*. In substance, she equates being a good Muslim with supporting ISIS and, because American authorities arrest and prosecute ISIS supporters, a good Muslim cannot live in America. It is a position that only an ISIS supporter would hold and that the overwhelming majority of Muslims in America and worldwide would strongly oppose.

> Also indicative of the defendant's views are the various statements in which she disparages the US justice system. While negative views could be normal for any defendant, [the defendant] frames her criticism of the US justice system in religious terms by using the word kuffar, "infidels" (see email dated 2/22/2019 "win this case against these kuffar" and Facebook post 6/13/2018 "I was once a prisoner in dar ul kufr"). These statements indicate that the defendant does not recognize the legitimacy of the US legal system since it is not based on Islamic law but, rather, it is run by kuffar and based on laws other than sharia. It is, once again, a position that only somebody that believes in jihadist ideology would have.

Vidino Rpt. at 27-28.

The defendant also has repeatedly either minimized her crimes or entirely denied responsibility for them and claimed she has been persecuted because of her religion and/or because she is poor. On February 24, 2019, the defendant wrote, "I did not do anything wrong as a Muslim but a cyber crime in social media which is a violation in USA to support certain shari'ah so al maghreb tul horriya." On February 27, 2019, the defendant wrote, "the truth it very simple it a conspiracy of material support knowing and supporting propaganda internationally…it cyber crime on social media and most it private msggs and it how they can look into our stuff just like they do to other pppl and plus I'm poor." On October 11, 2022, the defendant wrote, "I'm not even a criminal." On December 4, 2022, the defendant wrote, referring to her upcoming sentencing, "being in the custody of the government. . . . Yeah. So

94

yeah I'm going to make this – I'm telling you – this time around this - it's going to be very like

long but it's going to be clear that it's basically not all my fault. [En-heh]. So."  And on March

30, 2023, the defendant stated that she could not get justice "because I'm black and I'm

Muslim."

       As the circumstances of the defendant's violations of the conditions of her

supervised release, her commission of the Failure to Appear Offense and her subsequent conduct

while incarcerated all demonstrate, these behaviors, this mindset, continue to this day.  The

defendant does not believe it was wrong for her to lie to her probation officer, faults the

government for seeking to hold her accountable for her crimes and her widespread misconduct,

continues to use extremist language, and demonstrates a continued fixation on ISIS and extremist

subjects.

       All of this is consistent with the conclusions of Dr. Katsavdakis, the forensic

psychologist who examined the defendant and submitted an expert report in advance of the

defendant's original sentencing in 2019.  His central conclusion in 2019 was that the defendant

"pose[d] a moderate risk for violent/extremist beliefs, further radicalization and possible

acts."  June 17, 2019 Mem. Exhibit 2 (Katsavdakis Rpt.) at 15.   This is based on, *inter alia*, his

conclusion that the defendant demonstrates a "fixation or pathological preoccupation for

extremist related causes," one which continues to the present day despite the defendant's

attempts to "cloak[]" this fixation in "curiosity."  Id. at 16.  This is seen in the defendant's

conduct on presentence release in 2018, supervised release in 2020 and 2021, her flight from

prosecution, and a litany of statements denying accountability for her actions and claiming, in

essence, that all she ever did was stand up for her religion.

The defendant's history of having suffered "terrible sexual, physical, and emotional abuse for much of her life," is—of course—a mitigating factor that the Court can and should consider in determining an appropriate sentence. United States v. Ceasar, 10 F.4th at 79–80. But as the Court of Appeals concluded even before it had been presented with the defendant's widespread violations of supervised release and the commission of her third felony offense, it is but one mitigating factor that must be balanced against the other, significantly aggravating, sentencing factors, and "does not . . . cancel out the seriousness of her offenses." Id.

The Court of Appeals also faulted Judge Weinstein for "imposing a sentence so heavily based on the prospective creation of one or more [rehabilitation] programs." Id. at 80. The Court of Appeals explained that Judge Weinstein's "apparent acceptance of the experts' agreement that 'no such satisfactory general [deradicalization or disengagement] program exists in the United States' is in considerable tension with its emphasis on Ceasar's need for rehabilitation as the factor that most influenced its sentencing decision." See id. And indeed, no such program has since been created. The defendant's experts who testified at the defendant's first sentencing hearing, Ms. Daisy Khan and Dr. Katherine Porterfield, that they would create a program to assist the defendant never did so. And as described above, the government's investigation of the defendant's violations of supervised release have shown that even as Ceasar engaged in a more limited way with Ms. Khan and Dr. Porterfield, the defendant was actively circumventing and violating the monitoring conditions of release imposed by the Court and engaging in prohibited communications with extremists and prior convicted felons. But despite the defendant's violations of supervised release, this Court tried to implement Judge Weinstein's vision for the defendant's rehabilitation when it agreed with the defense request to hold

96

sentencing on the VOSR in abeyance while the defendant was assessed for participation in the

DEEP program.  The Court explained its view that

> giving respect to Judge Weinstein who I know devoted a lot of time to this
> case, her testimony from numerous mental health experts and radicalization
> experts, and came up with a sentence that he thought would reflect the need
> for Ms. Ceasar to receive certain types of counseling. It seemed to me that
> this was the program that Judge Weinstein was hoping for and would
> address the kinds of concerns that all of us have when people provide
> material support to terrorist organizations.

Mar. 30, 2021 Tr. at 5.  In sum, the Court gave the defendant yet another chance, but the

defendant discarded this one as she did all the others.  As detailed above, within two months, the

Probation Department learned that DEEP had suspended the defendant's sessions with Dr.

Schouten because the defendant simply stopped attending.

The defendant's rejection of the very rehabilitative opportunities that Judge

Weinstein crafted her original sentence to provide is, unfortunately, consistent with a concern

that Dr. Katsavdakis highlighted in the report he submitted in connection with the defendant's

2019 sentencing.  Specifically, Dr. Katsavdakis highlighted that the defendant was reluctant to

seek out care, "repeatedly find[ing] reasons to negate potential benefits of treatment." And

perhaps most disturbingly for the Court, Dr. Katsavdakis found that the defendant "demonstrated

repeated instances of deceptive behavior, as well as a primitive attempt (e.g.. denial) for

engaging in behavior despite evidence to the contrary."  Id. at 17.  The defendant exhibited this

deception even during her time with Dr. Katsavdakis, answering "false" to his question about

whether she ever lies to avoid getting into "tight situations."  Id.  This answer from the defendant

is of course belied by, among other things, her guilty plea to destroying numerous electronic

messages to avoid their detection by law enforcement, her admission to the Court that she lied to

the government during the January 2019 interview, her continued deception of the Probation Department, and even her flight upon realizing that she would be sent back to prison.

    C.    <u>The Need to Avoid Unwarranted Sentencing Disparities Supports the Imposition of a Guidelines Sentence</u>

        As the Court of Appeals recognized in remanding this case for resentencing, the 48-month sentence imposed by Judge Weinstein for the defendant's commission of two separate felony offenses was markedly below the sentences that other judges in this District have imposed on defendants convicted only of providing or attempting to provide material support to a foreign terrorist organization. <u>See</u> <u>United States v. Ceasar</u>, 10 F.4th at 84. As the Court of Appeals observed, other defendants who have recruited others and attempted to travel to join ISIS, as the defendant did in committing the Material Support Offense, have faced statutory maximum sentences of 20 years, <u>see</u> <u>id.</u> at 84-85 (citing <u>United States v. Naji</u>, No. 16-cr-653 (FB) (E.D.N.Y. June 11, 2019)), or 15 years, <u>see</u> <u>id.</u> at 85 (citing <u>United States v. Saidakhmetov</u>, No. 15-cr-95 (WFK), 2018 WL 461516 (E.D.N.Y. Jan. 18, 2018) and <u>United States v. Juraboev</u>, No. 15-cr-95 (WFK), 2017 WL 5125523, at *1, (E.D.N.Y. Nov. 1, 2017)). But while these sentencing comparisons to other Section 2339B defendants demonstrate the need for a significant sentence to punish the defendant for the seriousness of her commission of the Material Support Offense, in this consolidated sentencing hearing where the defendant also faces sentencing for *two* subsequent and separately committed felony offenses, these comparison are useful only insofar as they aid the Court in estimating the minimum extent of the range of permissible sentences available to the Court.

        The defendant is, to put it simply, *sui generis*. The government is unaware of any other defendant who has pleaded guilty to providing material support to ISIS (or any other foreign terrorist organization) and been released on bail only to violate the terms of her

cooperation agreement, reconnect with people she herself identified as ISIS supporters, lie to the government, destroy evidence of her conduct, and be convicted of a new felony offense for that separate and subsequent criminal conduct.[34]  All that was true at the defendant's June 2019 sentencing hearing.  But the defendant has now done much more than even that.  Released from prison while the government's appeal was pending, the defendant went on to repeatedly violate the conditions of her supervised release, regularly lie to and deceive her probation officer and the Court, and upon learning that she would be resentenced, attempted to flee the country, in the process committing an unprecedented third separate felony offense.  There is simply no other terrorism defendant who compares to the defendant's history of recidivism, and her persistence and consistency in disobeying the lawful authority of the Court.

The defendant's continued engagement in criminal activity and deception shows that despite her guilty pleas, she has not truly accepted responsibility for her actions.  Rather, she has downplayed the seriousness of her crimes and blamed others for her getting caught and for

---

[34]    Pugh is thus distinguishable because in that case the defendant obstructed justice by destroying electronic devices to conceal evidence of his provision of material support to ISIS before he had even been arrested, and Judge Calabresi, writing only for himself, expressed concern that Pugh's case was an example of prosecutors using an obstruction count as "a tacked-on charge" to increase the defendant's sentencing exposure beyond that fixed by Congress for the underlying crime.  See United States v. Pugh, 945 F.3d 9, 29 (2d Cir. 2019) (Calabresi, J., concurring).  Even a judge performing the "searching and contextual" review that Judge Calabresi recommended in Pugh, see id. at 29-30, would be forced to conclude that in this case, the defendant's Obstruction Offense punishes the defendant for separate and distinct criminal conduct, serious in its own right, resulting from the defendant's efforts to conceal her continuing contact with other ISIS supporters even after she had pleaded guilty to Material Support.  The concern Judge Calabresi articulated when he opined that a sentence for obstruction of justice should not reflect "prosecutorial or judicial dissatisfaction with the limits Congress placed on the gravity of that underlying crime," but "the severity of the obstruction of justice in the context of a particular underlying crime," simply does not apply to the Obstruction Offense for which the defendant must be sentenced.  Id. at 30.

persecuting her.  She did not honor her cooperation agreement with the government; rather, she violated it repeatedly.  She has not repudiated ISIS, its supporters or its brutal violence, which she previously celebrated; on the contrary, when released for just a brief period, she contacted and attempted to contact ISIS supporters and sought out more ISIS news and propaganda.  She was not honest and forthright; instead, when given a chance to explain her conduct on presentence release the defendant lied, repeatedly, including about using her ISIS *nom du guerre*. She clings, still, to the hateful and divisive 'us versus them' dichotomy of true Muslims versus non-believing "kuffar."    And even after being returned to custody after failing to appear as required, she repeatedly violated BOP rules and engaged in unmonitored conversations.

> D.    A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law

A Guidelines sentence is also necessary to adequately deter criminal conduct—in this case, terrorism aimed at harming Americans and American interests—and to promote respect for the law prohibiting such destructive conduct.  See 18 U.S.C. § 3553(a)(2)(A)-(B). As Judge Walker stated in his concurrence in Stewart, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." Stewart, 590 F.3d at 181.

The capacity of a terrorist organization like ISIS to thrive hinges in large part on its ability to grow its membership—to attract, indoctrinate, and enlist new followers, like the defendant, who are committed to advancing and serving ISIS's murderous agenda or die trying. It is only through this support that ISIS and other terrorist groups are able to fulfill their missions of hate, murder, and violence.  Deterring such conduct is particularly important in today's environment, when so many young people in the West, including in the United States, have become radicalized by jihadist propaganda online and have either traveled or tried to travel to the

Middle East to join ISIS and other terrorist groups.  It is vital for our country's national security that other young men and women who reside in the United States, when exposed to hateful extremist teaching, be deterred from choosing to follow a path similar to the defendant and engaging in potentially devastating conduct in support of such groups.  It is important for those contemplating joining a terrorist organization to know that the consequences for such conduct are serious.  And it is important for the public to know that those who seek to join and support terrorist organizations will face serious punishment preventing them from causing harm to society.  A Guidelines sentence is necessary and warranted in this case to serve the pressing need for general deterrence of such terrorism offenses.

Finally, a Guidelines sentence is also required to deter other individuals from engaging in the type of wanton obstruction and deception engaged in by the defendant *after* she pleaded guilty to the Material Support Offense and agreed to cooperate with the government. The importance of this cannot be overstated.  Despite the serious nature of her terrorism offense, the government – as it must do to cooperate any defendant in order to pursue additional serious criminal activity – trusted the defendant and took a significant risk in doing so.  The defendant, instead of embracing this extraordinarily rare opportunity to repay that trust with honesty, and thus chart a better course for herself, instead abused it.  She lied and destroyed evidence to hide her actions from the government and this Court and she did so repeatedly, first in violation of conditions of bail and later in violation of conditions of supervised release.  The defendant's conduct on bail jeopardized ongoing terrorism investigations that had been informed by the information she provided.  And her extensive efforts to circumvent the monitoring restrictions imposed as a condition of her supervised release and deceive her probation officer and the Court about her non-compliance forced the Probation Department and the FBI to invest significant

resources to investigate and learn the truth about her behavior and then find and arrest her when she fled accountability for her crimes.  Moreover, the defendant made manifestly clear that she cannot be trusted to follow even the most basic conditions of supervision, including to tell the truth, let alone abandon the extremist ideology that she continues to espouse.

It is thus vital that the sentence the Court imposes in this case clearly demonstrates the serious consequences that all defendants, and particularly cooperating witnesses, will face when they fail to honor their obligation to be truthful, comply with the law, and respect the lawful authority of the Court.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court

impose a sentence for the Material Support, Obstruction and Failure to Appear Offenses within

the applicable Guidelines range of 360 to 840 months' imprisonment as such a sentence is

sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to

18 U.S.C. § 3553(a).

Dated:    Brooklyn, New York
          October 15, 2024

                              Respectfully submitted,

                              BREON PEACE
                              UNITED STATES ATTORNEY
                              Eastern District of New York

                    By:    /s/ Douglas M. Pravda
                           Douglas M. Pravda
                           Ian C. Richardson
                           U.S. Department of Justice
                           (718) 254-6268